NORTHWESTERN RY. CO. v. CHICAGO & P. RY. CO. See Case No. 2,665.

---

## Case No. 10,341.

### NORTHWESTERN UNION PACKET CO. v. ATLEE.

[2 Dill. 479; 12 Am. Law Reg. (N. S.) 561; 7 Am. Law Rev. 752; 18 Int. Rev. Rec. 157.] [1]

Circuit Court, D. Iowa. 1873.[2]

ADMIRALTY — JURISDICTION — RIPARIAN RIGHTS — PIERS IN THE NAVIGABLE CHANNEL.

1. The district court, as a court of admiralty, has jurisdiction of a cause wherein the libellant seeks to recover damages caused to his vessel by a pier erected by the respondent, without legal authority, within the navigable channel of the Mississippi river.

[Cited in The Maud Webster, Case No. 9,302; Leonard v. Decker, 22 Fed. 743.]

2. A riparian proprietor on the Mississippi, although he be the owner of a saw mill thereon, has no right, without legislative authority, to erect a solid pier of masonry within the navigable channel of the river, in order to fasten thereto a boom for the protection of logs; and such a pier comes within the legal notion of a nuisance.

[Cited in Rutz v. St. Louis, 7 Fed. 440; Ladd v. Foster, 31 Fed. 834; Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 563.]

[Cited in Providence Steam-Engine Co. v. Providence, etc., S. S. Co., 12 R. I. 368.]

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission. 7 Am. Law Rev. 752, contains only a partial report.]

[2] [Reversed in 21 Wall. (88 U. S.) 389.]

3. The respondent *held* to be in fault for failing to keep such a pier lighted at night, in consequence of which libellants' vessel was sunk, and her cargo injured.

4. Extent of riparian rights on the Mississippi river considered.

This is an appeal by the libellants from the decree of the district court in admiralty, holding that there was mutual fault, and ordering an apportionment of the damages. The packet company above named filed a libel in admiralty in the district court, against the respondent, Atlee, to recover damages for injuries to the barge Reaney and cargo, by reason of its running against a pier placed in the Mississippi river by the respondent. The accident, or collision, as it is termed in the record, happened about eleven o'clock on the night of the 23d day of April, 1871. The steamboat Sheridan, with the barge Reaney in tow, lashed to her starboard side, was descending the river from St. Paul to St. Louis, this being her first trip during the season, and struck the upper pier of the respondent. The night was dark, and there was no light upon the pier at the time. The respondent had for many years been the owner of a tract of land bordering on the Mississippi river, just below the town of Fort Madison, Iowa. Upon this land, and near the bank of the river, he has erected extensive mills for the purpose of sawing logs, mostly pine, which come down in rafts from the pine regions of the upper Mississippi, into lumber. These rafts or logs, coming down during the high water, or the rafting season, the respondent has for years been in the practice of mooring in the water opposite his land, and near his mill, and in the neighborhood of the piers built by him and presently to be described. These rafts remained in the water until the logs were sawed, and frequently extended further out into the stream than the location of the pier with which the barge collided. As the respondent found his rafts somewhat insecure when fastened in this manner, he built, in the winter of 1870–71, in the river, near his mills, two piers (one several hundred feet below the other), to which he attached a boom, for the better protection of his logs. The injury complained of was occasioned by the upper pier. During the summer of 1870 the respondent had placed in the river a pile of rock, covered with water when the river was high, and exposed to view when it was low. The upper pier was constructed by building on this rock pile a crib, which was filled with stone. The pier is twenty-nine feet by twenty-two feet in size, and is about twenty-five feet high, above the bed of the river. Whether it is in the channel or not, is a disputed question, in relation to which a great mass of testimony was taken. The following facts are not controverted, or are clearly established: The upper outside corner of the pier is about one hundred and forty-nine feet from the bank of the river, and about one hundred and twenty feet from the bank at the stage of water which existed at the time of the collision, and at low water about ninety-nine feet from the bank. The water is about twelve feet deep along the outside of the pier at a low stage of the river; at the time of the collision, the water was about twenty feet deep at the pier. About six or seven hundred feet above is a bar, or delta, from a creek, which projects into the river about three hundred feet, from which point the bank of the river recedes, so that the complainant's land on the bank is about two hundred feet in from where a straight line drawn from the point of the delta to the shore below would come. Outside of this pier there is a free passage way for boats several hundred feet in width. The pilot of the Sheridan was skillful and competent, and fully acquainted with the river, but he had no knowledge of the existence of the pier. He was employed as a pilot during the entire season of 1869 on the upper Mississippi, but not in 1870. The pier was constructed in the winter of 1870–71, and the Sheridan at the time of the collision was making her first trip for the season. He did not keep the boat to the middle of the channel, but ran, or allowed the boat to run, where the pier stood. The barge struck the upper outside corner of the pier (which projected above the water only a few feet), and sank almost immediately. After the collision, the respondent kept lights burning upon the piers. The water is deep enough, even in a low stage, to allow steamboats to pass inside the piers erected by the respondent, and the testimony of more than a dozen pilots is to the effect that before the erection of the piers they had often run their vessels over and about the place where these piers stand. The district court decided that both parties were in fault—the respondent for failing to keep lights on the pier, and the boat for not keeping more in the middle of the stream—and divided the damages in accordance with the admiralty rule. [Case unreported.] The total damages reported by the commissioners were $2,147.86, and from the decree confirming this report the libellants appeal.

Howell & Rice and J. H. Davidson, for libellants.

McCrary, Miller & McCrary, for respondent.

DILLON, Circuit Judge. The respondent, who is an extensive manufacturer of lumber from logs, and the proprietor of land on the Mississippi river, upon which his saw mills are situate, the better to carry on his business erected the piers and boom mentioned in the statement of the case. This boom is several hundred feet in length, and is attached to two piers built in the river. The piers are twenty-five feet in height above the bed of the river, and a few feet in height above the surface of the water, and are in size twenty-nine feet by twenty-two feet. They are from

one hundred to one hundred and fifty feet from the bank, the distance depending on the stage of water, and the water, even in a low stage, is twelve feet deep at the piers. Boats of the largest size, and at any stage of water, can pass inside of the piers if the way be not obstructed by logs or artificial erections.

The jurisdiction of the district court in admiralty of the case made by the libel, is settled by the supreme court of the United States, and need not be further noticed. 23 How. [64 U. S.] 209.

The right of the respondent to erect and maintain these piers, at the place, and under the circumstances, stated, presents the main question in the case, and it is a question of great importance. The court may properly take notice that a large portion of all the lumber which is supplied from the pine regions of Wisconsin and Minnesota is floated down the Mississippi in log rafts, which are owned by, or sold to, owners of mills located upon the banks of the river. It is the almost invariable practice of the mill owner to moor the logs in the stream in front of, or near, his mill, and the logs, in general, remain in the stream until they are taken therefrom, one by one, into the mill to be sawed.

The more effectually to secure or protect his logs, the respondent built the piers and boom in question. It is conceded that there is no statute of congress, or of the state, authorizing the erection. Its rightfulness depends, therefore, upon the general principles of the law. The respondent claims the right as riparian proprietor, and it follows, of course, that if he has the right, every other like proprietor has the same right.

Notwithstanding the able argument contained in the opinion of his honor in the court below, I have not been able to reach the conclusion that the right claimed for the respondent exists; and although, on a question of this kind, which he has so thoroughly considered, I may well distrust the correctness of my own views, still it is my duty to decide it according to my own judgment. It is not my purpose to enter upon any extended argument against the right which is set up by respondent, but only to indicate briefly the grounds of my opinion.

The paramount right attaching to the Mississippi river is the right to its free and unobstructed navigation. This is a public right. It exists in favor of the whole public, and for all vessels, small as well as large, and for rafts equally with boats. Any erection or obstruction not authorized by competent legislative enactment, which materially interferes with the paramount right of navigation, is unlawful, and comes within the legal notion of a nuisance. The analogy between the river and a highway or street, as respects public rights, is very close. The river is a highway, or waterway, for the use of the public, just the same as a street or highway; and individuals, for their own convenience, have no more right, without legislative authority,

to obstruct the one than they have to encumber or obstruct the other. Their rights in both cases are confined to a reasonable use of that which is common to all, and which may not be exclusively appropriated by any.

Telegraph poles, or gas posts, or market houses, in the public streets, are, or may be, convenient and useful, not only to individuals, but to the public; but if put there without legislative sanction, they are, in law, nuisances. And so with any unauthorized individual appropriation of any part of a street. Much more clearly would the law pronounce illegal any exclusive appropriation of a portion of the public way by individuals, for their own convenience, by erections or acts which would, or might, endanger the safety of the public.

The same principles apply to the rights of the public in the river. The adjacent owner may make a reasonable use of the river and the banks. He may, doubtless, land his rafts, and fasten them to the bank in front of his property. How long he might keep his logs stationary in the water, we need not inquire, for the injury to the libellant's vessel was not caused by coming in contact with logs thus moored by the riparian proprietor, but by piers of solid masonry, built at a point which the evidence establishes to be within the navigable channel of the river, even at its lowest stage. No individual can, of his own motion, and for his own advantage, abridge or infringe the rights of the public in respect to the navigation of the river. A pier built within the navigable channel, that is, at a point in the river where vessels may go, and where they have the right to go, is an unlawful structure in the eye of the law. Indeed, any permanent structure which interferes with, or which may endanger or obstruct, navigation, is unlawful, and cannot be legalized by any considerations of utility, or otherwise, except by direct legislative authority.

Accordingly, it has been held that the erection and maintenance, without legislative permission, of a dam in the Wisconsin river, at a place where it is navigable in fact, is unlawful, whether it does or does not interfere with the navigation of the river. Wisconsin River Imp. Co. v. Lyons, 30 Wis. 61.

It is suggested that there is an analogy between piers like those erected by respondent and bridges across navigable streams. But, though bridges across such streams may be of great private convenience and public utility, still legislative sanction is necessary to legalize their existence.

Again, it is argued that the right of the respondent to build and maintain the piers in question rests, or may be rested, upon the same grounds upon which rests the right of the riparian proprietor to erect wharves and landing places for his own and the public use. Structures of the character just named, connected with the shore, when not

erected in violation of legislative regulations, when they do not obstruct the paramount right of navigation, and are not nuisances in fact, have the sanction of long usage in this country, and, under the qualifications suggested, may be lawfully erected; but the right, it is said, must be understood as terminating at the point of navigability. Dutton v. Strong. 1 Black [66 U. S.] 23, 32; Yates v. Milwaukee, 10 Wall. [77 U. S.] 497.

The reason why wharves and landing places are thus sanctioned is, that they are aids to navigation, and necessary for the reasonable enjoyment of the respective rights of the public and the riparian proprietor. But the right to erect piers in the navigable channel, in order to construct a boom for the protection and detention of logs until the riparian proprietor may manufacture them, rests upon no such usage; nor can such be justly said to be aids to navigation, which, it is to be remembered, is the paramount right—not in the least to be infringed, without legislative sanction.

If the piers in question be considered unlawful, the liability of the defendant is clear. The pilot of the libellants' boat had no knowledge of the piers, and there was no light upon them to warn him of their existence. In my judgment, he is not to be held in fault for not knowing that there was an unlawful obstruction in the river, and standing further out in the stream. Undoubtedly, if he had known of the piers, and if they had been lighted so that he could have seen their location, it would have been his duty, if practicable, to have kept his boat away from them. In my opinion, the fault lies wholly with the respondent. This is clearly so, if the pier on which the boat was injured was not lawfully there. But suppose I am in error in the above view, I still think the fault is with the respondent, because of the failure to have lights upon it. The river was high; it was at a season of the year when usually there were no rafts moored in the stream, and it was not unlikely that boats might run against it. I cannot think the pilot is in fault, under these circumstances, for not having run his boat farther out in the stream. So that, in any view of the case, I consider the respondent liable for all the damages.

It is suggested that these views will occasion alarm to mill owners upon the Mississippi; but I perceive no cause for apprehension. If it should be deemed of sufficient importance, congress would doubtless concede all necessary rights, and regulate the mode of their enjoyment. This may, perhaps, be also done by the state, in the absence of action by congress. But, without such legislative action, it is not probable that mill owners will be disturbed in the exercise of their accustomed privileges so long as they are reasonably enjoyed, and do not essentially interfere with or endanger the paramount right of a navigator. The decree below will be reversed, and a decree entered here for the appellant against the defendant for the $2,147.86 reported by the commissioners. Reversed.

[NOTE. An appeal was then taken to the supreme court. where the decree of this court was reversed. with instructions to render a decree on the basis of the commissioner's report, for half the damages which he found the libellants to have suffered. 21 Wall. (88 U. S.) 389.]

NOTE. As to obstructions in navigable rivers. Add. Torts, p. 169, c. 4, § 1, and cases cited. Since the appeal in the foregoing case was taken. congress, on the 3d day of March. 1873 (18 Stat. 606), authorized "the owners of saw mills on the Mississippi river, under the direction of the secretary of war, to construct piers or cribs in front of their mill property, on the banks of said river, for the protection of their mills and rafts against damage by floods and ice; provided however, that the piers or cribs so constructed shall not interfere with, or obstruct, the navigation of said river," etc. This enactment implies that piers built in the river, and which interfere with, or obstruct, its navigation, are illegal.

The supreme court of Michigan, at the July term, 1873, decided the following points: 1. Where a brig bound for Chicago broke a boom in passing out of Manistee river, and was proceeded against under chapter 210 of the Compiled Laws of 1871, relating to "proceedings for the collection of demands against water-craft," it was held that while the act cited was meant to give relief where the vessel was at the time navigating the waters of the state, and where no remedy could be had in admiralty, it was not confined to water-craft intended for use only in the waters of this state. Judge Campbell, dissenting from a majority of the court, held that the act was designed to authorize proceedings analogous to those in admiralty, and to create a lien not enforceable in any other way. The City of Erie v. Canfields [27 Mich. 479]. 2. A boom that extends no farther into the water than the landowner, with due regard to navigation, might extend it, is a structure pertaining to the adjacent land, as much as any wharf or building erected thereon, and a wrongful injury to it is not a marine injury, and the tort cannot. therefore, be redressed in admiralty. Id. 3. The right of navigation is not so far paramount as to make booming facilities a nuisance wherever they encroach on navigable waters, and in any case the question of nuisance must depend on the particular facts. The necessity and convenience of the floatage of lumber in the Manistee river, in the region of which the manufacture of lumber is the prime industry, must be considered in any rules laid down for the public use of the stream. Id.