[No. 131. Decided March 12, 1891.]

## C. EISENBACH, J. S. PIERCE, EDWARD HOARE, SAMUEL C. WHEELWRIGHT, HUGH GLENN, JR., *et al.* v. E. H. HATFIELD.

RIPARIAN RIGHTS — TIDE LANDS — WHARVES AND DOCKS — ACCRE-
TION — INJUNCTION.

The tide lands of the State of Washington belong to the state, which has full power to dispose of. them subject only to the restrictions imposed by the constitutions of the state and of the United States; and no individual can claim any easement in, or impose any servitude upon, the tide waters of the state without the consent of the legislature.

A riparian proprietor on the shore of the sea or its arms has no rights, as against the state or its grantees, to extend wharves in front of his land below high water mark.

Under artitle 15 of the state constitution, requiring the legislature to provide for the appointment of a commission whose duty it shall be to locate and establish harbor lines in the navigable waters of all harbors of the state, wherever such navigable waters lie within or in front of the corporate limits of any city, or within one mile thereof; and, further, to provide general laws for the leasing of the right to build wharves, docks and other structures upon certain designated areas, or to provide by general laws for the building and maintaining of wharves, docks, and other structures upon such areas, a riparian proprietor within a mile of the corporate limits of any city has no right to extend wharves in front of his land below high water mark except by permission of the state.

The act of the territorial legislature of 1854, authorizing bank owners to build wharves in front of their premises, was but a license and, until availed of, was revocable; and the constitution and subsequent laws have abrogated the act.

The right of a riparian owner to future accretions to his land is not a vested right, as there can be no present vested right in that which may never have an existence.

The building by the state or its grantees of wharves upon shores of navigable waters is neither a taking nor a damaging of private property for public use.

A riparian proprietor cannot maintain injunction against the owners of valuable improvements in actual use for commerce, trade and business, made on tide lands in front of his premises prior to March 26, 1890, as, by the Laws 1889-90, p. 435, § 11, the owners of such improvements are given the exclusive right of pur-

chase of the land so improved for a period of sixty days after their final appraisal by the state.

(STILES, J., dissents.)

*Appeal from Superior Court, Pierce County.*

Suit for injunction brought by E. H. Hatfield against C. Eisenbach, J. S. Pierce, Edward Hoare, Samuel C. Wheelwright, Hugh Glenn, Jr., Twyman O. Abbott, John Smith, John Doe, and Richard Roe.

After the complaint was filed, and a temporary order issued, plaintiff filed an amended complaint, which alleged, in substance, that he was the owner of certain upland bordering and abutting upon the high water mark of Puget Sound; that by reason of such ownership he was entitled to certain littoral rights in and to the shore opposite his lands, and that the appellants were occupying the shore opposite his land, and erecting structures and improvements thereon. Defendants filed an answer disclaiming any right or title to any land above high water mark, and alleging that the land occupied by them is part of the shore of Puget Sound, and that valuable improvements, in actual use for commerce, trade and business had been made upon said lands long prior to the passage of the tide lands act of March 26, 1890, and that said improvements were on March 26, 1890, and prior thereto, in actual use for commerce, trade and business, and that the defendants are the owners of and in possession of such improvements; and alleging the purpose of the appellants to erect on said shore conveniences for shipping, and that the plaintiff would have the right, in common with all other persons, and upon the same terms, to use such conveniences when erected; and denying that the plaintiff had been denied access from his lands to the navigable waters of Puget Sound for any purposes of commerce or navigation; and denying that the appellee has desired access to or egress from the waters of Puget Sound for any purpose of commerce or

navigation ; and alleging that the harbor lines have not been fixed opposite said lands, and that the lands have not been disposed of by the State of Washington; and denying that the appellants have wrongfully or unlawfully obstructed plaintiff's access to the navigable waters of Puget Sound. To this answer plaintiff demurred, on the ground that the same did not state facts sufficient, and this demurrer was sustained. Defendants declined to answer further, and a final decree of perpetual injunction was made, from which defendants appeal.

*Calkins & Shackleford,* for appellants.

The owner of upland abutting upon an arm of the sea where the tide rises and falls has no riparian rights. Such land in England belongs to the king, in America to the state. There are no riparian rights in the ocean. *Pollard v. Hagan,* 3 How. 212; *Martin v. Waddell,* 16 Pet. 410; *Boston v. Lecraw,* 17 How. 426; *Hoboken v. Pennsylvania R. R. Co.,* 124 U. S. 656; *Martin v. O'Brien,* 34 Miss. 21; *State v. Mayor, etc., of Jersey City,* 25 N. J. Law, 525; *Stevens v. P. & N. R. R. Co.,* 34 N. J. Law, 532 (3 Am. Rep. 269); *Galveston v. Menard,* 23 Tex. 393; *Parker v. Taylor,* 7 Or. 435; *De Force v. Welch,* 10 Or. 507; *Lansing v. Smith,* 8 Cow. 146; *People v. Vanderbilt,* 26 N. Y. 287; *Towle v. Remsen,* 70 N. Y. 303; *Langdon v. Mayor,* 93 N. Y. 155; *Com. v. Alger,* 7 Cush. 53; *Clancey v. Houdlette,* 39 Me. 451.

The State of Washington is the owner of the shore and of tide lands. Const. of Wash., art. 15 and 17. The State of Washington by its act of March 26, 1890, providing for the sale of shore lands, has recognized the right of the appellants to occupy the shore, and has given them the first right to purchase. Laws 1889–90, p. 431. Every state adopts its own rules and makes its own laws for the sale and disposition of tide and shore lands. This question is one for the state exclusively, and one in which congress and the United States courts can take no part. *Bar-*

*ney v. Keokuk*, 94 U. S. 324; *City of St. Louis v. Myers*, 113 U. S. 566.

*Doolittle, Pritchard, Stevens & Grosscup*, for appellee.

The owner of land abutting upon the navigable waters of an arm of the sea, by virtue of such ownership and the appurtenances to his land, has certain natural rights called riparian or littoral rights, consisting of the free and undisturbed access from the front of his land to such navigable waters, and incidentally the right to facilitate such access by the erection of wharves and piers. *Buccleuch v. Metropolitan Board of Works*, L. R. 5 H. L. 418; *Metropolitan Board of Works v. McCarthy*, 7 H. L. 243; L. R. 1 App. Cases, 662; *Yates v. Milwaukee*, 10 Wall. 497; *Railroad v. Schurmeir*, 7 Wall. 272; *Dutton v. Strong*, 1 Black, 23; *Case v. Toftus*, 39 Fed. Rep. 730; *Weber v. Board of Harbor Commissioners*, 18 Wall. 57; *Railway Co. v. Renwich*, 102 U. S. 180; *Tuck v. Olds*, 29 Fed. Rep. 738; *State v. Ill. Cent. R. R. Co.*, 33 Fed. Rep. 730; *Bowman's Devisees v. Wathen*, 2 McLean, 376. Favoring our position are decisions of various state courts. In Oregon, *Wilson v. Welch*, 12 Or. 353; *Parker v. West Coast Packing Co.*, 17 Or. 510 (21 Pac. Rep. 822). In California, *Shirley v. Bishop*, 67 Cal. 543 (8 Pac. Rep. 82). In Rhode Island, *Clark v. Peckham*, 10 R. I. 35 (14 Am. Rep. 654). In Wisconsin, *Delaplaine v. C. & N. W. Ry. Co.*, 42 Wis. 214 (24 Am. Rep. 386); *Boorman v. Sunnuchs*, 42 Wis. 243; *Diedrich v. N. W. R. R.*, 42 Wis. 248 (24 Am. Rep. 399); In Minnesota, *Carli v. Stillwater St. R. R. Co.*, 28 Minn. 373 (41 Am. Rep. 290); *Brisbine v. St. Paul & Sioux City R. R. Co.*, 23 Minn. 114; *Miller v. Mendenhall*, 43 Minn. 95 (19 Am. St. Rep. 219; 44 N. W. Rep. 1141). In New Hampshire, *Clement v. Burns*, 43 N. H. 609. In Missouri, *Meyers v. City of St. Louis*, 8 Mo. App. 266; *Myers v. City of St. Louis*, 82 Mo. 367. In Pennsylvania, *Tinicum Fishing Co. v. Carter*, 61 Pa. St. 21 (100 Am. Dec. 597); *Pittsburgh v.*

*Scott*, 1 Barr, 314. In Michigan, *Rice v. Ruddiman*, 10 Mich. 125; *Bay City Gas Light Co. v. Industrial Works*, 28 Mich. 182; *Pere Marquette Boom Co. v. Adams*, 44 Mich. 404; *Watson v. Peters*, 26 Mich. 517; *Lorman v. Benson*, 8 Mich. 18 (77 Am. Dec. 435); *Lincoln v. Davis*, 53 Mich. 375 (51 Am. Rep. 116). In Connecticut, *Mather v. Chapman*, 40 Conn. 382 (16 Am. Rep. 46); *State v. Sargent*, 45 Conn. 358. In Maine, *Moulton v. Libbey*, 37 Me. 472 (59 Am. Dec. 57); *Welles v. Bailey*, 55 Conn. 292 (3 Am. St. Rep. 48; 10 Atl. Rep. 565). In Maryland, *Baltimore & Ohio R. R. Co. v. Chase*, 43 Md. 23; *State v. Mayor*, 52 Md. 422.

The opinion of the court was delivered by

Anders, C. J.—In this case this court is called upon for the first time to determine the rights of littoral proprietors of lands abutting upon the shore of an arm of the sea in which the tide ebbs and flows; and, while it is scarcely necessary to look beyond our own constitution and laws for authority to guide us to a conclusion, still, owing to the importance of the questions both to individuals and the public, and the magnitude of the interests involved, we have examined the numerous authorities cited by the learned counsel for the respective parties in the elaborate briefs which they have filed, in order that we might familiarize ourselves with the decisions of other courts upon the subject, and with the reasons upon which their decisions are based. We shall not attempt, however, to review all of the decisions in detail, for that would be impracticable, if it were desirable, but will only refer to a few of the cases especially alluded to by counsel.

In this state the common law is our rule of decision in the settlement of questions requiring judicial determination, when not specially provided for by statute. And it seems to be generally conceded that at common law the title to the soil under tide water was vested in the crown. The ownership of the soil was regarded as a *jus privatum*, and

could be conveyed to individuals, subject only to the pub-
lic right of navigation and fishing, which public right was
under the absolute control of parliament. In this country
we have the highest authority in support of the doctrine that
the state has succeeded to all the rights of both king and
parliament, and hence is the absolute owner of all navigable
waters and the soil under them within its territorial limits.

This question was thoroughly discussed by the supreme
court of the United States in the case of *Martin v. Waddell,*
16 Pet. 367. That was an action of ejectment for land
under the waters of Raritan Bay in New Jersey, over which
the tide ebbed and flowed. The land in controversy was
included in a large tract which was granted by the King of
Great Britain to the Duke of York, and subsequently be-
came vested in the proprietors of East Jersey, who after-
wards surrendered to the crown all their governmental
powers, but retained all their rights of private property.
One of the parties to the action, as the grantee of the state
of New Jersey, under a law of the state, claimed the exclu-
sive right to take oysters in the place granted, and the
other claimed the same right by virtue of his title from the
proprietors. The right of the crown to make the grant to
the Duke of York, which not only included the tide land,
and also the waters and soil under the waters, as well as
the power of the state to convey the same, were questions
thus brought directly before the court for determination;
and it was held that the king, as the representative of the
nation, had an unquestionable right to make the grant to
the Duke of York, with all the prerogatives and powers of
government therein contained. In discussing the question
as to whether, since *Magna Charta,* the king had power to
grant land covered by navigable waters to an individual,
so as to give him an exclusive right of fishing within the
limits of the grant, Mr. Chief Justice TANEY said:

"And we the more willingly forbear to express an opin-
ion on this subject because it has ceased to be a matter of

16 — 2 WASH.

much interest in the United States; for, when the revolution took place, the people of each state became themselves sovereign, and in that character hold the absolute right to all their navigable waters, and the soils under them, for their own common use, subject only to the rights since surrendered by the constitution to the general government. A grant made by their authority must therefore manifestly be tried and determined by different principles from those which apply to the grants of the British crown."

The natural and logical conclusion of the court was that the grant by the state conferred upon its grantee the exclusive right to take oysters within the territory covered by the grant.

The question of the ownership of lands under tide water was again raised in the same court in the case of *Pollard's Lessee v. Hagan*, 3 How. 212, which was ejectment for a lot of land in the city of Mobile, in Alabama, which lay below high water mark, and which had been granted to plaintiff by congress. After approving the decision in the case of *Martin v. Waddell*, Mr. Justice McKINLEY, in the course of his opinion, says:

"Then to Alabama belong the navigable waters, and the soils under them, in controversy in this case, subject to the rights surrendered by the constitution to the United States; and no compact that might be made between her and the United States could diminish or enlarge these rights."

The court further says that, "by the preceding course of reasoning, we have arrived at these general conclusions — (1) The shores of navigable waters, and the soils under them, were not granted by the constitution to the United States, but were reserved to the states, respectively; (2) the new states have the same rights, sovereignty and jurisdiction over this subject as the original states; (3) the right of the United States to public lands, and the power of congress to make all needful rules and regulations for the sale and disposition thereof, conferred no

power to grant to the plaintiffs the lands in controversy in this case."

Again, in the case of *Weber v. Board of Harbor Commissioners*, 18 Wall. 57, it was held that to the State of California, upon her admission into the union, passed the absolute property in and dominion over all soils under tide water within her limits, with the consequent right to dispose of the title to any part thereof in such manner as the state might deem proper, subject to the paramount right of navigation over the waters, so far as such navigation might be required by the necessities of commerce with foreign nations and among the several states, the regulation of which was vested in the general government. Opinion of Mr. Justice FIELD, at page 65.

The court went still further in the case of *McCready v. Virginia*, 94 U. S. 391, and there held that not only the soil under tide waters in the state, but the waters themselves, and the fish in the waters, so far as they are capable of ownership, belonged to the state, and that the legislature had the constitutional right to pass a law prohibiting any person not a citizen of the state from fishing in such waters. And in *Willson v. Black Bird Creek Marsh Co.*, 2 Pet. 245, the court sustained an act of the legislature of Delaware authorizing the damming up of a navigable stream for the benefit of adjoining lands.

The case of *Hoboken v. Penn. R. R. Co.*, 124 U. S. 656 (8 Sup. Ct. Rep. 643), was an action of ejectment for land occupied by the railroad company along the margin of the Hudson river. Plaintiff claimed by dedication of the street to the water by the original proprietor of the land, as evidenced by the "Loss" map. Defendant claimed by virtue of a grant from the state. Mr. Justice MATTHEWS, speaking for the court, said :

"The nature of the title in the state to lands under tide water was thoroughly considered by the Court of Errors

and Appeals of New Jersey in the case of *Stevens v. Patterson & Newark R. R. Co.*, 34 N. J. Law, 532 (3 Am. Rep. 269). It was there declared (page 549) 'that all navigable waters within the territorial limits of the state, and the soil under such waters, belonged in actual propriety to the public; that the riparian owner, by the common law, has no peculiar right in this public domain as incidents of his estate; and that the privileges he possesses by the local custom, or by force of the wharf act, to acquire such rights, can, before possession has been taken, be regulated or revoked at the will of the legislature. The result is that there is no legal obstacle to a grant by the legislature to the defendant of that part of the property of the public which lies in front of the lands of the plaintiff, and which is below high water mark.' It was therefore held in that case that it was competent for the legislative power of the state to grant to a stranger lands constituting the shore of a navigable river under tide water, below the high water mark, to be occupied and used with structures and improvements in such a manner as to cut off the access of the riparian owner from his land to the water, and that without making compensation to him for such loss."

And again :

"Our conclusion, therefore, is that the grants from the state of New Jersey, under which the defendants claim, respectively, are a complete bar to the recovery sought against them in these suits."

And finally :

"Under these grants they have and hold the rightful and exclusive possession of the premises in controversy against the adverse claim of the plaintiff to any easement or right of way upon and over them, by virtue of the original dedication of the streets to high water mark on the Loss map."

The foregoing decisions of the highest judicial tribunal of the United States, without other or further authority, would seem to settle, beyond controversy, the question of title to the tide lands of this state, and to leave no doubt whatever that they belong to the state in actual propriety,

and that the state has full power to dispose of the same, subject to no restrictions save those imposed upon the legislature by the constitution of the state and the constitution of the United States; and, if this be true, it necessarily follows that no individual can have any legal right whatever to claim any easement in, or to impose any servitude upon, the tide waters within the limits of the state, without the consent of the legislature.

But, in order that there might be no doubt upon this vexed question, the constitution of the state has spoken upon the subject. Sec. 1, art. 17 of that instrument, declares that "the State of Washington asserts its ownership to the beds and shores of all navigable waters in the state, up to and including the line of ordinary high tide, in the waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes: *Provided,* That this section shall not be construed so as to debar any person from asserting his claim to vested rights in the courts of the state." And so zealous were the people of the state in guarding their rights in these lands that they inserted a proviso in the constitution to the effect that no law of Washington Territory, granting shore or tide lands to any person, company, or any municipal or private corporation, should be deemed valid. Const., art. 17, § 2.

Appellee contends, however, that whatever may be the title of the state to the soil under tide water, he, by virtue of his contiguity to the water, has certain rights in the shore beyond those of the general public, and which are peculiar to himself, among which are a right to wharf out opposite to his upland, a right of ferriage, a right of unobstructed access to the navigable water in front of him, and a further right to accretions that may hereafter be formed, and that all of these rights are property, and are " vested rights." And in support of this contention the learned

counsel for appellee have cited many authorities, among which are *Dutton v. Strong,* 1 Black, 23; *Railroad Co. v. Schurmeir,* 7 Wall. 272; *Yates v. Milwaukee,* 10 Wall. 497. But, before proceeding further, it may be proper here to observe that riparian rights in the several states are settled by the respective states for themselves. See *St. Louis v. Myers,* 113 U. S. 566 (5 Sup. Ct. Rep. 640); *Barney v. Keokuk,* 94 U. S. 324; *Willson v. Marsh Co.,* 2 Pet. 245.

In *Dutton v. Strong,* cited by appellee as an authority in favor of his right to wharf out against his premises, the facts before the court were as follows: The defendant in the court below had constructed a landing or bridge pier in front of his premises, extending to the navigable waters of the lake. Plaintiff's vessel was moored to this pier in a storm and, by force of a gale, was about to pull down and destroy defendant's structure, when he, after requesting the master of the vessel to detach the same, but who refused to do so, cut the hawser, whereby the ship was set adrift and sunk. Plaintiff sued for the resulting damage. The court held that the defendant had a right to erect the pier where it was, and to protect the same by cutting the vessel's fastenings, even although it was thereby exposed to destruction. Speaking of the origin of riparian rights in this country, Mr. Justice CLIFFORD said:

"Our ancestors when they immigrated here undoubtedly brought the common law with them as part of their inheritance; but they soon found it indispensable in order to secure these conveniences, to sanction the appropriation of the soil between high and low water mark to the accomplishment of these objects. Different states adopted different regulations upon the subject, and in some the right of the riparian proprietor rests upon immemorial local usage. No reason is perceived why the same general principle should not be applicable to the lakes, although those waters are not affected by the ebb and flow of the tide."

We have no doubt of the correctness of that decision,

and this court would undoubtedly follow it in a similar case.

The case of *Railroad Co. v. Schurmeir* involved the title to land on the Mississippi river at St. Paul. Schurmeir's premises were bounded by high water mark of the river, but the land in front had been filled in and built upon, down to extreme low water mark; and it was held that he had a right, as riparian proprietor, to the reclaimed land, as against the railroad company. And, at page 289, Mr. Justice CLIFFORD said:

"Although such riparian proprietors are limited to the stream, still they also have the same right to construct suitable landings and wharves, for the convenience of commerce and navigation, as is accorded riparian proprietors bordering on navigable waters affected by the ebb and flow of the tide."

But it will be remembered that the same learned judge said in *Dutton v. Strong* that different states adopted different regulations upon the subject; and no doubt the decision of the case was in no way in conflict with the "regulations" of Minnesota.

The question before the court in *Yates v. Milwaukee* was as to the validity of an ordinance of the city of Milwaukee declaring a wharf belonging to Yates a nuisance; and it was remarked by Mr. Justice MILLER, in speaking generally of riparian rights on navigable streams, that, whether the title of such owner extended beyond the dry land or not, he has the right of access to the navigable part of the river, and to make a landing, wharf or pier for his own use, or that of the public, subject to such general rules and regulations as the legislature may see proper to impose for the protection of the rights of the public, whatever they may be, and that it is a valuable right and property, and a right of which, when once vested, the owner can only be deprived in accordance with established law, and, if necessary that it be taken for the public good, upon due compensation.

But if the court in these cases really intended to say that the same rule applied to the shore of the sea, or the arms of the sea, and that a riparian proprietor has a right as against the state to erect wharves extending below high water mark, we cannot see how these can be reconciled with other decisions of the court, especially with that of *Hoboken v. Railroad Co., supra.* But it would seem, however, that the court in the later case of *Weber v. Commissioners* did make a distinction between tidal and non-tidal waters; for in that case Mr. Justice FIELD, after approving the doctrine laid down in *Yates v. Milwaukee*, says:

"Nor is it necessary to controvert the proposition that in several of the states, by general legislation or immemorial usage, the proprietor whose land is bounded by the shore of the sea, or of an arm of the sea, possesses a similar right to erect a wharf or pier in front of his land extending into the waters to the point where they are navigable. In the absence of such legislation or usage, however, the common-law rule would govern the rights of the proprietor, at least in those states where the common law obtains. By that law the title to the shore of the sea and of the arms of the sea and in the soils under tide waters is, in England, in the king, and in this country in the state. Any erection thereon without license is therefore deemed an encroachment upon the property of the sovereign, or, as it is termed in the language of the law, a purpresture, which he may remove at pleasure, whether it tend to obstruct navigation or otherwise."

We think the above is a correct statement of the law applicable to riparian rights on tide waters, and that it is fully supported by the authorities. Gould, Waters, § 167, and cases cited; *Com. v. Alger,* 7 Cush. 53; *Dana v. Wharf Co.,* 31 Cal. 118 (89 Am. Dec. 164); *Martin v. O'Brien,* 34 Miss. 21. And in this connection it must not be forgotten that in the cases of *Dutton v. Strong, Railroad Co. v. Schurmeir,* and *Yates v. Milwaukee,* as well as that of *Case v. Toftus,* 39 Fed. Rep. 730, also cited by counsel, the respective ri-

parian proprietors had already erected their improvements, presumably with the license of the state, and therefore had vested rights of property which it was proper to recognize and protect. This seems to have been the view of Mr. Gould, for, in a note to § 149 of his work on waters, in which he quotes from the opinion of the court in the case of *Yates v. Milwaukee,* he uses this language:

" In this case the wharf which it was attempted to condemn as a nuisance was actually built."

In *Ravenswood v. Flemings,* 22 W. Va. 52 (46 Am. Rep. 485), which is a well considered case, it was held, under a law of that state, that a riparian proprietor on a navigable river had no right to build a wharf, ferry or bulk-head, below high water mark, without the consent of the town council, and that he might be prevented from so doing by injunction. And in *Com. v. Alger, supra,* the court, in a most learned and elaborate opinion by Chief Justice SHAW, sustained an indictment against the defendant for extending a wharf beyond the harbor line in the city of Boston, on his own land; and, further, that the statute establishing harbor lines, and taking away the rights of proprietors of flats in the harbor beyond the lines, to build wharves thereon, even when they would be no injury to navigation, and providing for no compensation to such proprietor, was not unconstitutional as taking private property for public uses without compensation.

We think the authorities abundantly show that a riparian proprietor on the shore of the sea, or its arms, has no rights as against the state or its grantees to extend wharves in front of his land below high water mark.

But, if this were not so, we would still be constrained to hold that appellee has no such rights; for the constitution of the state, which is the supreme law of the land, expressly declares that the legislature shall provide for the appointment of a commission, whose duty it shall be to locate and

establish harbor lines in the navigable waters of all harbors of the state, wherever such navigable waters lie within or in front of the corporate limits of any city, or within one mile thereof, upon either side; and, further, that the legislature shall provide general laws for the leasing of the right to build wharves, docks and other structures, upon certain designated areas, or the legislature may provide by general laws for the building and maintaining, upon such area, wharves, docks and other structures. Const., art. 15. Nor can the right to wharf out be claimed under the act of the territorial legislature authorizing bank owners to build wharves in front of their premises. That act was but a license, at most, and, until availed of, was revocable, and the constitution and subsequent laws have abrogated the law.

But appellee claims that he has a vested right to future accretions to his land, and cites as authority to sustain his position the case of *County of St. Clair v. Lovingston*, 23 Wall. 46. And the court in that case does say that the riparian right of future accretions is a vested right. But we are unable to see how one can have a present vested right to that which does not exist, and which may never have an existence. It seems to us that the more reasonable doctrine is announced in the case of *Taylor v. Underhill*, 40 Cal. 471, in which case the court says:

"The plaintiff, as a riparian owner, has also a right to accretions to his land, and it is said the claim of defendant will be a cloud upon his title to such accretions. But, as yet, there is no such property, and there may never be. He cannot ask the court to interfere in advance, and prevent a cloud being cast upon his title to that which may never had an existence."

The case of *Railway Co. v. Renwick*, 102 U. S. 180, cited by appellee, was an action for damages by a riparian proprietor on account of the building of a railroad along the Mississippi river in front of his premises. The court

held that the plaintiff could recover, but placed its decision upon a statute of Iowa (1874), providing for compensation to riparian owners in such cases. Previous to this statute it was held in the case of *McManus v. Carmichael,* 3 Iowa, 1, after an exhaustive review of the authorities, that the title of riparian owners extended only to high water mark; and in the case of *Tomlin v. Railroad Co.,* 32 Iowa, 106, 109 (7 Am. Rep. 176), the court held that "the doctrine deducible from adjudged cases is that, by the rules of the common law, the owner of land along the shore of a navigable river is entitled to no right, either in its shores or waters, as an incident of his ownership, except the contingent ones of *alluvion* and *derelictum.* Hence he is not entitled to damages for an improvement made along the banks of such river, by authority of the state, the effect of which is to deprive him of free access to the stream."

The same question was before the court of appeals of New York in the case of *Gould v. Railroad Co.,* 6 N. Y. 522, and was decided the same way. In that case the court, quoting *Lansing v. Smith,* 4 Wend. 9 (21 Am. Dec. 89), said:

"The bank of the Hudson river, between high and low water mark, belonged to the people, and the riparian proprietor had no better right to the use of it than any other person. If he built on it or erected a wharf there, it would be a purpresture, which the legislature might direct to be demolished, or to be seized for the use of the public. Or the legislature might authorize erections in front thereof, as in case of Smith's wharf on the Thames."

And in *Stevens v. Railroad Co.,* 34 N. J. Law, 532 (3 Am. Rep. 269), it was held that, although an owner of land adjacent to navigable water is more conveniently situated for the enjoyment of the public easement than others, he has, by virtue of common law, no more or greater rights than the rest of the community. In *Langdon v. Mayor,* 93 N. Y. 129, 155, it was said that the legislature of the state, where not restrained by constitutional inhibitions, could authorize a

boom to be placed across the Hudson river for private use, and that the right of the state to grant the navigable waters, except as restrained by constitutional checks, is as absolute as its rights to grant the dry land which it owns, and that the state holds the public domain as absolute owner, and not as a trustee, except as it is organized, and possesses all its powers and property for the public benefit. See, also, Wood, Nuisances (2d ed.), 538, and notes.

Many decisions of the various state courts have been cited by appellee as sustaining a contrary doctrine to that of the above cases, but we find, upon examination, that they are mostly (especially those referring to riparian rights in tide waters) based either upon statutes or local customs, and are therefore not precedents binding upon us. Our attention is also called to the English cases of *Buccleuch v. Board of Works*, L. R. 5 H. L. 418, and *Lyon v. Fishmongers' Co.*, 17 Moak, Eng. R. 51, only the latter of which, however, we have had an opportunity to examine; and in that case the principal question involved was the construction of an act of parliament which distinctly recognized riparian rights in the owner, and which provided (§ 179) that "none of the powers by this act conferred, or anything in this act contained, shall extend to take away, alter or abridge any right, claim, privilege, franchise, exemption or immunity to which any owner or occupier of any lands, tenements or hereditaments on the banks of the river, including the banks thereof, or of any aits or islands in the river, are now by law entitled, nor to take away or abridge any legal right of ferry, but the same shall remain and continue in full force and effect as if this act had never been made." The statute is a very broad and comprehensive one; and, as it was not questioned but that Lyon's wharf was erected and used where it was in accordance with the law, the owner was entitled to the "privilege" of continuing to use it, as against the Fish-

mongers' Company, "as if the act had never been made." Indeed, it was conceded in argument that he had a right of access from the river to the front of his wharf, but it was contended that he had no such right as to the side next Winckworth's Hole, which was merely an inlet from the river. The court held otherwise; and its conclusion was evidently in accordance with the provisions of the act in question, although at variance with the earlier common-law doctrine, as laid down by Lord MANSFIELD in *Rex v. Smith,* 2 Doug. 425, in which that eminent jurist held that the king might authorize the erection of a structure in front of defendant's premises, between high and low water mark in the river Thames, even though the defendant was thereby cut off from the use of his wharf.

The result of our investigation of the authorities leads us to the conclusion that riparian proprietors on the shore of the navigable waters of the state have no special or peculiar rights therein as an incident to their estate. To hold otherwise would be to deny the power of the state to deal with its own property as it may deem best for the public good. If the state cannot exercise its constitutional right to erect wharves and other structures upon its public waters in aid of navigation without the consent of adjoining owners, it is obviously deficient in the powers of self-development, which every government is supposed to possess — a proposition to which we cannot assent. See *Galveston v. Menard,* 23 Tex. 349. Nor do we think this view in any way conflicts with the constitution of the state, but, on the contrary, we believe it is in strict harmony with it, when all its parts are construed together. We cannot think that the building by the state or its grantees of wharves upon shores of navigable waters would constitute either a taking or damaging of private property for public use, in contemplation of the constitution. See *Com. v. Alger, supra.*

The next question to be considered is, by what right, if

any, do appellants occupy the shore in front of appellee's premises? And in considering this question it must be remembered that the demurrer in this case admits that they have thereon valuable improvements in actual use for commerce, trade and business, and that said improvements were on said lands on March 26, 1890, the date of the passage of the tide land act; that said lands are within one mile of the corporate limits of the city of Tacoma ; that the harbor lines have not been fixed opposite to said lands; and that the same have not been disposed of by the state. Appellee has never erected any improvements on the shore, but claims that the appellants are trespassers, and that, as against them, he is entitled to relief by injunction. On the other hand, appellants claim to be rightfully in possession of the disputed lands by authority of the act of the legis- lature above mentioned. Section 11 of this act provides that " the owner or owners of any lands abutting or front- ing upon or bounded by the shore of the Pacific Ocean, or of any bay, harbor, sound, inlet, lake or water-course, shall have the right for sixty (60) days following the filing of the final appraisal of the tide lands, to purchase all or any part of the tide lands in front of the lands so owned : *Provided,* That if valuable improvements, in actual use for commerce, trade or business, have been made upon said tide lands by any person, association or corporation, the owner or owners of such improvements shall have the ex- clusive right to purchase the land so improved for the period aforesaid: . . . *Provided,* That nothing in this act shall be so construed to apply to any improvements made after the passage of this act."

We think, by a fair construction of this statute, that appellants are rightfully in possession of the disputed premises and have a right to maintain their improvements as they were on March 26, 1890, but that they have no right to enlarge their erections prior to such time as they

may be authorized to purchase the lands from the state. For the foregoing reasons the judgment of the court below is reversed, and the cause remanded for further proceedings in accordance with this opinion. So ordered.

HOYT, SCOTT, and DUNBAR, JJ., concur.

STILES, J. (*dissenting*). — The plaintiff in the superior court, the appellee here, alleged ownership of lots 15, 16 and 17, in blocks 1 and 2, in Wallace's addition to the city of Tacoma; that his lots had a water frontage on Puget Sound, a navigable arm of the sea, for a distance of more than one hundred and fifty feet; that defendants had, about May 1, 1890, taken exclusive possession of the shore in front of his lots, including all the area between high and low water marks, and had placed certain obstructions in the way of his access to the water, and were threatening to increase the obstructions, and refused him any access to the water from his land, or to permit him to enjoy any of his riparian rights. The prayer of the complaint was for a mandatory injunction to secure the removal of the obstructions. The answer admitted plaintiff's ownership to high water mark, but denied his right of access and all other riparian rights; admitted taking possession of the shore; claimed improvements in actual use for commerce, trade and business on March 26, 1890, and prior thereto, and the right to purchase the land improved under the act of that date; and alleged the distance between high and low water marks to be not exceeding two hundred and fifty feet, and from high water to water of the depth of five fathoms to be four hundred feet. The court below sustained a demurrer to the answer, and the opinion of this court has reversed the ruling.

I think the demurrer should have been sustained — *First*, for the reason that the allegations of the answer, intended to show improvements March 26, 1890, were not

the statements of any fact, but conclusions of law; and, *secondly,* on the main question, because the law of the case is different from that announced by the court in its decision.

This is the first instance in the recorded history of English or American law where private persons, for private ends, have been sustained by a court in taking and maintaining permanent possession of the shore of an arm of the sea, or of any navigable water, to the exclusion of the owner of the bank from passing over it to the water; and if the act of March 26, 1890, has the effect ascribed to it, it is the first act of an English or American legislature, not excepting those of New York and New Jersey, which has ever done so much. The public right in navigable waters, and to the soil underlying them, have been freely regulated and disposed of by both parliament and the legislatures; but both have held sacred the rights admitted to exist in connection with the lands bordering the waters, whether with or without constitutional rules against taking private property without compensation. These rights have been regulated in divers ways proper to their locality, according to the complicated necessities of crowded harbors or the unfrequented shores of remote waters; but while it is true that a few courts have theoretically denied, many have actually upheld them, and no other legislature has ever ignored them. Even the act o. the legislature of New York, in 1840, which gave rise to the case of *Gould v. Railroad Co.,* 6 N. Y. 548, made the most ample provision for drawbridges, so as to continue navigation in bays and streams cut off by the railroads, and for the extension of wharves and docks across the tracks to the river beyond; all of which was in obedience to the settled policy of the state, inaugurated in 1786, which prohibited the sale of any shore lands to other than riparian owners. *Rumsey v. Railroad Co.,* 114 N. Y. 423 (21 N. E. Rep. 1066). Of the other old states, every one, from the Massachusetts colony in 1641

down to New Jersey in 1848 and 1869, has similar provisions to those of New York, and a similar policy. Of the younger states, while some have no provisions by statute on the subject, every one which has a statute yields to the shore owner the right to wharf, and in the great majority of the others the courts have held such a right to exist whenever the question has been presented. I know this argument proves nothing in the face of the claim that it is for every state to settle for itself, through its legislature, what its policy in this regard will be. I adduce it merely by way of offering a reason why this court should be slow to conclude that the effect of the act of 1890 was, and was intended to be, what it has now been decided to be.

We are not a new people. As an organized community we date from 1853. True, the sovereignty was withheld until 1889; but, upon the faith of a policy adopted and placed among the statutes of the territory in 1854, lands were acquired upon the shores of our navigable waters, and improvements made at great cost by private persons — improvements which had a large share in making it possible for Washington to become a state, but which the principle of the court's decision would render it possible for the very next legislature to sweep out of existence or confiscate without compensation. This was a territorial statute, it is true; but the territory was competent to frame, and did frame, policies in a hundred other particulars between which and this I can see no distinction. If Massachusetts, in 1641, when a mere colony of Great Britain, could absolutely grant away the soil beneath the waters, so as to bind her when she became a state, as well as the states of Maine and New Hampshire; and if the provincial governor of New York could, in 1689, grant to the city of New York the fee of the shore between high and low water marks, whereon are now based some of the most valuable titles in that city and in the world — it would seem to be no

great violation of common sense to say that the Territory
of Washington could lawfully legislate to the extent of the
act of 1854. And who has ever questioned the title to
shore lands under the Massachusetts ordinance, or under
the Dongan charter of 1689?

But it is said that the constitution, or the act of 1890,
or both together, have repealed the act of 1854. Let us
see. In the schedule of the constitution (art. 27, § 2), in
obedience to the last clause of § 24 of the enabling act, it
was provided that all laws in force in the territory, not re-
pugnant to the constitution, should remain in force until
they expired by limitation or were repealed by the legis-
lature; and then there was a proviso "that this section
shall not be so construed as to validate any act of the legis-
lature of Washington Territory granting shore or tide
lands to any person, company, or any municipal or pri-
vate corporation." What effect does that proviso have on
any such act? It prevents the constitution from "vali-
dating" it. If the act was a valid law, it continued so; if
it was invalid, it continued the same. Everybody knows
that the proviso was aimed at a single case where the legis-
lature of the territory did once attempt to grant shore
lands to a railroad company; and it was merely to prevent
that act from gathering force from the constitution, so as
to render that valid which it was suspected had become or
had always been invalid, that the proviso was enacted.
The grant was believed to have been a fraud, and dead in
law, and the proviso was to prevent its being galvanized
into life. But the act of 1854 (code, § 3271) was not a
grant of lands in any sense. This court has said it was
"but a license, at most"; and, while I do not agree that
the right to wharf out was dependent upon the act, the
court's statement is good law, to the effect that it was not
a grant of tide or shore lands, and therefore was not cov-
ered by the proviso in question. But mark the difference

when the constitution touches shore lands covered by patents of the United States, taken and paid for in good faith by settlers. Article 17 treats of tide lands, and in its second section the state expressly disclaims all title to such patented lands, unless the United States shall set aside the patents as fraudulent. Now, under the case of *Pollard's Lessee v. Hagan*, 3 How. 229, these patents, so far as the tide lands were concerned, were absolutely void, and the lands would have belonged to the state but for the constitutional waiver made by the people of the state, in their high sense of fairness and justice.

The only other provision on the subject in the constitution is in § 1 of article 17, where the state's ownership of the beds and shores of all the navigable waters in the state to ordinary high water mark is asserted. But it did not require any such assertion to vest those lands in the state; for by an unbroken line of decisions, from far back of *Pollard's Lessee v. Hagan*, the courts have held that this ownership is in the state, thrust upon it as sovereign, in trust for its own people and those of the nation, for purposes of commerce and navigation as natural highways. It is idle to say that this assertion in the constitution conferred or strengthened the actual title of the state, and this could not, therefore, have been its purpose. But there was a valid purpose to subserve by this assertion, and that was to put it beyond question that in this state the sovereignty assumed was to high water mark, and not merely to low water mark. The United States, in all its grants, has conceded that the fast land stops at high water mark; but in some of the states, as Massachusetts, Rhode Island, Illinois, and Minnesota, the title of the shore owner has been conceded to extend to low water, or a certain distance below high water mark. This concession was by legislation in some states, and by the decisions of courts in others. *Meyers v. St. Louis*, 8 Mo. App. 266. I hold that it was to

place Washington in the rank of the greater number of
states which stop the title of the shore owner at high water
that the constitutional assertion of ownership was made,
and for no other purpose, since no other purpose could be
subserved by it. But mark, again, the care with which
this assertion of ownership was coupled with the proviso,
"that this section shall not be construed so as to debar any
person from asserting his claim to vested rights in the courts
of the state." Under the view the court takes of these con-
stitutional provisions, what vested right could there be to
which the proviso would apply? It could not have refer-
ence to any wharf property erected under the act of 1854,
since the court says that act was a mere license; and a mere
license is revocable at the pleasure of the licensor, and creates
no vested rights. *Kivett v. McKeithan,* 90 N. C. 106; *John-
son v. Skillman,* 29 Minn. 95 (43 Am. Rep. 192; 12 N. W.
Rep. 149); *St. Louis Stock Yards v. Wiggins Ferry Co.,* 112
Ill. 384 (54 Am. Rep. 243); *Cobb v. Fisher,* 121 Mass. 169.
So the court holds that the right to future accretions is not a
vested right, citing *Taylor v. Underhill,* 40 Cal. 471, although
that was merely the refusal of the court to declare a void cer-
tificate of purchase from the state a cloud upon plaintiff's
right. This leaves nothing whatever for the constitutional
provision to act upon, and the language, under the court's in-
terpretation, is mere sound without any substance whatever.

The article (15) on harbors and tide waters is nothing
more than a limitation upon the legislature prohibiting it
forever from disposing of the sea or river beds beyond
certain lines in front of incorporated towns. Such lines
exist in all important harbors, and are drawn to preserve
the public right of navigation. Usually their location is
changed from time to time as circumstances require, and it
was a change of this kind, fully authorized by the state,
that produced the case of *Yates v. Milwaukee,* 10 Wall.
497. The court seems to construe § 2 of this article as

though there were never to be any wharves here except "upon certain designated areas," and that construction is quite harmonious with the views taken of the constitutional scheme as a whole; but, if anything else were necessary to convince one that the whole construction is wrong, this would supply it. Certainly no equally absurd scheme could be contrived, unless some one were to propose that until the state builds its wharves, all ships must be anchored at the harbor line — cargo and passengers to get ashore as best they can.

Turning now to the act of March 26, 1890, the first thing that attracts attention, as having a bearing on the matter under discussion, is that, for some reason, the law gives the pre-emptive right to buy tide lands, with certain exceptions, not to the public at large, but to the upland owner; and therein, I maintain, is fashioned the general policy of the state on this subject, which is to enlarge the right conceded to be in upland owners by the act of 1854, and is exactly in harmony with the legislation of every other state in the union which has lands of this character and laws upon the subject. I say this is the policy, because it is not going outside of proper bounds to further say that, of all the shores of navigable waters within the State of Washington, not one ten-thousandth part will be free from this pre-emptive right of shore owners or their grantees, under § 12 of the act. This § 12 has some striking language in it, which, to my mind, further shows the policy. Under it, when an abutting owner has attempted to convey tide lands in front of his uplands, or littoral rights therein, his grantee may purchase the tide lands to the extent of the tract or rights (littoral rights) so conveyed. Now, what are the "littoral rights" which the upland owner could so convey? Are they what the constitution speaks of as "vested" rights? The mere license under the act of 1854 was not one of them, because a license is personal

to the licensee and cannot be conveyed.   13 Amer. & Eng.
Enc. Law, 545.   What "littoral" right could an upland
owner attempt to convey but his right to wharf out by way
of severance?   I confess inability to imagine any other;
and if there is no other, and this one has no existence, then
the statute has nothing to act upon.   But suppose it was
the wharf license that was meant, § 12 says nothing about
an executed license as the one to be confirmed; and, if this
be the littoral right intended, then the legislature did not
look upon the act of 1854 as repealed by the constitution.
Furthermore, it is hard to see what good the state's deed
to the shore owner's grantee will do for him, whether the
littoral right be natural or statutory, if the harbor line area
is to be a wall between him and deep water.   The state
would be driving a hard bargain, indeed, with any such
plan of operations, and is not to be suspected of such a
scheme.   But the most important thing about this § 12
is the legislative admission contained in it that the "land"
and the "littoral right" are two so distinct and severable
things that they may absolutely belong to different per-
sons by deeds from the state.   This is exactly what the
doctrine of riparian access and wharfage is, and the justice
of the provision made is apparent.

Lastly, touching the proviso of the eleventh section:

"That if valuable improvements, in actual use for com-
merce, trade or business, have been made upon said tide
lands by any person, association or corporation, the owner
or owners of such improvements shall have the exclusive
right to purchase the land so improved:   .   .   .   *Pro-
vided*, That nothing in this act shall be so construed [as]
to apply to any improvements made after the passage of
this act."

Here, again, the care of the legislature to preserve
the right of the upland owner to acquire these lands is
manifested most broadly; for, subsequent to the passage
of the act no enlargement of the improvements can be

made, and the court in its decision so holds. And it is also
to be noted that, whereas, the upland owner may acquire
all of the tide lands in front of his upland, the improver
has the pre-emptive right to nothing but the "land so
improved"; so that in this case the appellants' purchase
would be limited to the exterior line of their actual works
on the 26th day of March, 1890, and the appellee could
acquire all in front of them to the harbor line. Now, it
was settled in *Weber v. Board of Harbor Commissioners*,
that a purchaser of tide lands from the state was entitled
to none of the rights of a riparian owner. 18 Wall. 57.
Upon what consideration, then, was this pre-emptive right
conferred upon "improvers?" The act itself furnishes the
answer. By § 12, where the upland owner has by his deed,
for a consideration, conveyed his rights away, his grantee
will be protected; yet there may be another class who
have merit equally as strong as the grantee under a deed.
Where the owner of the fee of land has stood by for years,
while an adverse claimant under color of title has made
valuable improvements, the improvements offset the dam-
ages for withholding, *pro tanto* (code, § 541); and, if the
inaction of the owner continues beyond the term of our
statute of limitations, the very title is presumed to have
passed to the adverse party. An easement, however, of the
nature of which the upland owner's rights, both by nature
and by statute, largely partake, is much more easily lost.
It is lost if the holder of the right does, or permits to be
done, any act inconsistent with the future enjoyment of the
right. 6 Amer. & Eng. Enc. Law, 147. Therefore, if
an upland owner has in any case remained passive while
another has in good faith placed erections in the waters in
front of him, which have not been abandoned, but are in
customary use, the equitable policy of § 12 requires that
an estoppel be sustained against the denial of the upland
owner that he has conveyed to his permissive improver.

The courts, which have often restrained intrusions of this kind, when objected to promptly, would have supported such an estoppel; why, then, should not the legislature recognize it?

But I maintain that the statute did not and could not deprive the upland owner of his full right to move promptly in the courts for the removal of any obstruction to his access to the water, where it was placed there against his will, and under threats of force and violence, as the fact is admitted to be in this case, and that whenever such a state of facts exists any title derived from the state must be held in trust for the upland owner. Such cases are precisely within the principles of *Atherton v. Fowler,* 96 U. S. 513, and numerous other cases, where force, fraud and the misconduct of officers have transferred lands patented by the United States to their rightful owners. Emphasis is laid upon the construction by the last paragraph of the section, where it is provided that nothing in the act shall apply to improvements made after the date of its passage; showing the legislative intention to discourage all scrambling possessions or claims not founded upon the upland owner's deed. Conceding, however, that the act was intended to apply to such a claim as the one at bar, it cannot be regarded in any other light than as showing the intention to make improvements alone the basis for the state's parting with its legal title, leaving the holders of adverse equities to resort to the courts for their enforcement. *United States v. Schurz,* 102 U. S. 378. And here the importance attached to a pleading of the facts in the answer appears. None of the material averments of the complaint were denied; for the allegations therein of the plaintiff's various rights were not material. If by nature the plaintiff had the rights claimed, it was not necessary to plead them, and the statute gave him the exclusive right to purchase. The answer was a confession and avoidance

in the nature of a plea in bar. But the rules of equity pleading require that a plea in bar shall state the facts upon which the avoidance is claimed, so that the plaintiff may demur to the sufficiency of the facts as constituting a defense. *Goodrich v. Pendleton*, 3 Johns. Ch. 384; *McCloskey v. Barr*, 38 Fed. Rep. 165; *Pumpelly v. Green Bay Co.*, 13 Wall. 175; *Farley v. Kittson*, 120 U. S. 303 (7 Sup. Ct. Rep. 534). This answer alleged that valuable improvements in actual use for commerce, trade and business had been made upon said lands long prior to the 26th day of March, 1890, and that said improvements were, on March 26, 1890, in actual use for commerce, trade and business, and that the defendants were the owners of, and in possession of, such improvements. These allegations are all but legal conclusions. *Poorman v. Mills*, 35 Cal. 118 (95 Am. Dec. 90); *McCloskey v. Barr, supra.* The decision says the demurrer admits the truth of these allegations. But a demurrer admits the truth of such facts only as are well pleaded, and not of mere conclusions of law. Of what could these improvements consist that would bring the defendants within the statutes? It is clear that there were no docks, piers, wharves, or other conveniences of shipping, because it is declared, in the sixth paragraph, to be the intention of the defendants to erect and maintain such structures in the future. This court says they may not enlarge their present improvements; and their right to wharf out is precluded by the decision in *Weber v. Board of Harbor Commissioners*, and by the fact that either the upland owner or some one else may buy the area in front of them to the harbor line. I conclude, therefore, that there is nothing in the constitution or the statute which is hostile to the doctrine of riparian access and the right to wharf; that, if it is denied tentatively by § 1, art. 17, the proviso leaves it to the courts to say whether, under the

law, such rights exist; and that upon the pleadings the judgment should have been sustained.

The court has found that upon authority a riparian proprietor on the shore of the sea or its arms has no rights, as against the state or its grantees, to continued access to the water, or to extend wharves in front of his land below high water mark. In the language of Mr. Lewis, in his work on Eminent Domain (p. 83), it has done so "by a narrow and technical course of reasoning, based upon the fact that the title to the soil is in the state or the public;" and has not, as I conceive, accepted the great weight of authority both in England and America. To my mind, in reading its conclusion, it has completely ignored the prime common source of the state's title, and of the riparian claim to access, which is that the navigable waters are natural public highways. Yet, as compared with this matter of substance, all questions of reclamation, of accretion, and reliction, of fishery and sea weed, pale and fade into insignificance. It is as highways that the sovereignties of the world, and particularly our own, have any jurisdiction over the navigable waters, differing in any respect from their jurisdiction over the fast land, and their different jurisdiction is of precisely the same character as the jurisdiction over highways upon the land. Under the constitution of the United States, congress has the power to regulate commerce between the states and with foreign nations; but, while under this power it has never yet undertaken to dictate concerning the manner of construction of any land highway not undertaken by itself, it has gone upon the water highways, both tide and fresh, and assumed the broadest control, deepening channels, changing harbors, building dikes, and regulating the building of bridges, in all of which it has been sustained by the supreme court of the United States, solely because the waters are natural

highways. But it is at this point that the opponents of the riparian right of access make their strong stand, and where the forces of the parties for and against meet in final conflict; and that the court did not see fit to allude to this phase of the question is greatly to be regretted. For the real question involved here is not whether the owner of upland bordering upon the sea has any adverse claim to the soil under the water, as against the state, but whether, being upon his own fast land, he can step therefrom upon the public highway, and there, as a member of the public, enjoy the public right of passage.

In the case at bar the appellants, possessing themselves of the exact line which borders the land and the highway, say to the land owner: "You can reach the water by yonder street, or, if you will wait until we have built a wharf here, you can pass over it at the same rate of toll as any other person. In the mean time, you cannot pass at all."

The appellants, however, in order to sustain their own position, are forced to maintain the very doctrine they fight against — that of the right of access. They oppose the upland owner's access, but, having planted themselves in the highway, they propose to build wharves and maintain access themselves. By their improvements they propose to turn the shallows into land, and then will claim that access to the water is necessary to its enjoyment. But here is land formed by nature that since time was had no other outlet than over the sea, put there by nature as a highway. The land passed from the sovereign owner by right of discovery, the United States, by solemn patent to the appellee, who is now told that the highway he relied upon is forever closed without his consent and without any compensation for his loss. Has he been damaged? "Actually, oh, yes," will be admitted by his bitterest opponent; "but not in law, because the title to the land beneath this water is in the state." But wherein does the nature

of the state's title to soil under navigable waters differ from that of its title to soil of a land highway? No writer or court that I have been able to consult points out the distinction, if there be one, except the subjection of the state's title in the submerged soil to the constitutional powers of congress. If the purpose to be subserved by the state's holding the two titles are identical then, viz., the perpetuation of highways, it seems extremely difficult to argue on any secure or even plausible ground that the owner of land abutting on the sea has not the same right of access to and continuance of his highway as his neighbor who abuts upon a land highway. Certainly it is not necessary to argue what the rights of an abutter on a road or street are. The state, or its hand-maidens, the county, township or municipal corporation, regulate and improve the way, but they cannot destroy it or injure the abutter's direct access to it from every part of his frontage without compensation. A late writer on this subject says:

"'Once a highway, always a highway,' is an old maxim of the common law, to which we have often referred, and so far as concerns the rights of abutters, or others occupying a similar position, who have lawfully and in good faith invested money or obtained property interests in the just expectation of the continued existence of the highway, the maxim stills holds good. Not even the legislature can take away such rights without compensation." Elliott, Roads & S., p. 658.

To illustrate this by more explicit authority: It has long been settled that running a street railroad is a proper public use of a street, when built so as not to interfere unnecessarily with the public right to travel over it; and that the mere erection of such a structure on the surface of the street does not entitle an abutting owner to compensation, even when the fee of the street is in him. But in some large cities it became necessary to have elevated railroads to carry on the traffic. These were authorized by the leg-

islature of New York, with no provision for compensating
abutters; and in a very recent case where an elevated rail-
road had been built in front of his premises on Pearl street,
an abutting owner sued the railroad company for damages.
*Abendroth v. Manhattan Ry. Co.*, 122 N. Y. 1 (19 Am. St.
Rep. 461; 25 N. E. Rep. 496). The court of appeals in its
decision said: "The term 'abutting owner' will be used in
this judgment to denote a person having land bounded on the
side of a public street, and having no title or estate in its
bed or soil, and no interests or private rights in the street,
except such as are incident to lots so situated.    。  。  。
There is no finding that the plaintiff, or any one of his prede-
cessors, ever had any title to or estate in the land where-
upon this street is maintained, or any interest in the street
except that of an abutting owner." The court then recalls
numerous cases where abutting owners, both in city and
country, in England and America, had been allowed special
damages for obstructions in highways not opposite their
land, and not authorized by legislative enactment, as well
as several late cases in that state where the same principle
had been upheld, where the obstruction was by legislative
authority. Speaking of these last cases it says:

"The judgments for damages which have been recovered
and sustained against the elevated railroads do not and can-
not rest on the ground that the roads are public nuisances,
for they were constructed pursuant to statute; and besides,
as before stated, a public nuisance does not create a private
cause of action, unless a private right exists and is specially
injured by it. The only remaining ground upon which
they can and do stand is that, by the common law, the
plaintiffs had private rights in the streets before the roads
were built or authorized to be built.    。  。  。   The con-
stitution of this state provides: 'Nor shall private property
be taken for public use without just compensation.' It is
settled by *Story v. N. Y. Elevated R. R. Co.*, 90 N. Y. 122
(43 Am. Rep. 146), and *Lahr v. Metropolitan Elevated Ry.
Co.*, 104 N. Y. 268, that such rights as the plaintiff has in

Pearl street are private property, within the meaning of the constitutional provisions quoted. . . . It follows that the authority conferred by the legislature to construct the road is not a defense to the action."

As will be seen from the decision, so far as the public generally was concerned, no matter how great was the nuisance in the street, it could remain, because the legislature authorized it.

And while I am so near the subject, I will here refer to the case of *Hoboken v. Railroad Co.*, 124 U. S. 656 (8 Sup. Ct. Rep. 643), relied on by the court to sustain its decision; for the student of that case, it seems to me, must see that the only matter there in issue and decided was whether the State of New Jersey, as the superior of the city of Hoboken, could wholly destroy the public right of passage over filled up lands at the end of a street, beyond the end of the street as originally dedicated. No private citizen was complaining, and the court says, on page 693:

"The right insisted upon in these actions by the city of Hoboken is the public right, and not the right of individual citizens claiming by virtue of conveyances of lots abutting on streets made by Stevens or his successors in the title. The public right represented by the plaintiff is subordinate to the state, and subject to its control. The state may release the obligation to the public; may discharge the land of the burden of the easement, and extinguish the public right to its enjoyment. Whatever it may do in that behalf conclusively binds the local authorities, when, as in the present cases, the rights of action asserted are based exclusively on the public right."

And it might have added that the legislature of New Jersey could have altogether destroyed the corporation of Hoboken, but it could not touch the right of a single lot owner, corporation or no corporation, to pass from his lot to the street, and thence abroad. The difficulty which the court finds in harmonizing *Yates v. Milwaukee* and the other leading cases in the United States supreme court with *Ho-*

*boken v. Railroad Co.*, vanishes entirely when the right of the state to encumber a public highway, or to destroy it altogether, so far as the public right is concerned, is studied in connection with a case like that of *Abendroth* and the other New York elevated railroad cases, and the same principles are applied to both.

And now, the right to wharf is derived by strict analogy from the abutter's right in connection with a land highway; for no one questions the right of an abutter, where the improved roadway covers but a narrow strip in the middle of the way, to build for himself a convenient means to reach the traveled track over the intervening land; and so, on the waterway, the navigable part of the water is the actual way, to which the wharf is the reasonable means of access. And, as the right of access to the road pertains to every portion of the abutter's front, so the right to wharf belongs to all the riparian owner's front. I know it is said, in response to this, that the abutter cannot charge a toll to any member of the public who goes upon his sideway. Granted; but there is no question here of charging wharfage, which must be always reasonable, and is always under the public control. *Transportation Co. v. Parkersburg,* 107 U. S. 691 (2 Sup. Ct. Rep. 732). It was strongly intimated in *Yates v. Milwaukee* that, whenever the waterway was made navigable up to the line of the upland owner's land, he could then no longer maintain his right to project his wharf. But, except in very contracted waters, the cheaper and more practical way is to build out the wharves, instead of deepening the water. The deprivation of these private rights by the state, for its own public purposes, is the taking of property, whether on land or water, and must be compensated. Why, at this day, are these rights denied? I think this is the reason: Sometimes it happens that it is not necessary, for purposes of navigation, that the waterway should be as wide as

nature has made it. Moreover, the waters have washed down the banks, and made shoals and flats, which can be filled up and made fast land, valuable for building, and even farming, purposes. The self-interest of upland owners has led them, in some instances, backed by their lawful riparian rights, to claim substantially the whole beneficial use of the entire area from the high water mark to the point of navigability, by which means, and the non-assertion of the state's rights, they have filled up the flats, excluded the water, and made land of the whole. In some states, as Rhode Island and Minnesota, this has been conceded to them as a right, and the public has received nothing for its complaisance. This is not justice. The protest against such a monopoly has, as is often the case in such matters, overflown its proper bounds, and gone to the extent of denying all riparian rights. But there is a middle course, which is the right one in my judgment, and which the courts ought to pursue, as leading to the law of these cases. I regret that the decision here adopted follows one of the extremes, and not the middle course.

I now come to consider the cases cited by the court as requiring its conclusion. Theoretically that is not "land" which is beneath navigable water; from the high water mark all beyond is water. Grants of land stop at the margin, no matter how shallow or extensive may be the shoals beyond. Yet, although we do not endow the state as an ordinary landlord, we say that the title to the sea and river bottoms is in it. The state holds upland upon the same terms and with the same rights as a private citizen. We enforce this rule, even upon the federal government, in all but the matter of taxation and the right of eminent domain. There was a time when it was thought that the land beneath navigable waters belonged to the United States; but the supreme court in *Pollard's Lessee v. Hagan* awarded it to the several states. Yet in that great case (3 How. 229)

the court said that Alabama held these submerged lands as a part of her sovereignty and jurisdiction, not governed by the common law of England as it prevailed in the colonies before the revolution, but as modified by our own institutions; and that, "although the territorial limits of Alabama have extended all her sovereign power into the sea, it is there, as on the shore, but municipal power, subject to the constitution of the United States and the laws which shall be made in pursuance thereof." And it is worthy of note that the eminent counsel, who successfully presented that case for the defendant, said:

"A right to the shore between high and low water mark is a sovereign right, not a proprietary one. Rivers do not pass by grant, but as an attribute of sovereignty. The right passes in a peculiar manner; it is held in trust for every individual proprietor in the state or the United States, and requires a trustee of great dignity. Rivers must be kept open; they are not land which may be sold. *Martin v. Waddell.*"

I think there is a popular idea that *Pollard's Lessee v. Hagan* in some way involved the question of riparian rights. On the contrary, it was a contest between a patentee of tide flats from the United States, who was not an upland owner, and a squatter on the tide flats, who had no license whatever from the State of Alabama. The same repute is true of *Martin v. Waddell*, 16 Pet. 367. But the case was this: The titles to nearly or quite all the land in New Jersey came from the grantees of the Duke of York, to whom Charles II, in 1664, in consideration of the annual payment of forty beaver skins, gave a charter bestowing upon his royal brother the sovereignty and proprietorship of all the lands, bays, waters, rivers, soils, fisheries, etc., within a vast area. The duke immediately parceled out his domain, under grants equally generous in their terms with that of the king to himself, and under one of these the proprietors of East Jersey became vested with all his rights in the lands and waters

about Raritan Bay.   In 1702 the proprietors surrendered
to Queen Anne the sovereignty only; and, by the revolu-
tion, New Jersey became an independent state.   The royal
grants, however, were respected, and New Jersey had no
public lands.   The proprietors continued to make grants of
lands to colonists, and in a few instances attempted to convey
exclusive rights of fishing to individuals in certain defined
areas of Raritan Bay.   In 1821 one Arnold, the possessor
of such a fishery, sued one Mundy for trespass in entering
the limits of his fishery and taking away oysters.   The case
was appealed on a judgment for defendant, and is reported
in *Arnold v. Mundy,* 6 N. J. Law, 1 (10 Am. Dec. 356).
The ground of the decision was that, although the king of
England could by his royal charter grant to a subject an
indisputable title to any or all of the fast land, he could not
and did not grant one inch of the soil beneath the waters to
the Duke of York, because it belonged to the sovereignty,
which was held in trust for the common public, and was re-
turned to Queen Anne, to be devolved in turn upon the State
of New Jersey.   After stating some of the dispositions which
the state might make of these soils, the court said:

"The sovereign power itself, therefore, cannot, consist-
ently with the principles of the law of nature and the
constitution of a well-ordered society, make a direct and
absolute grant of the waters of the state, divesting all the
citizens of their common right [of fishery].   It would be
a grievance which never could be long borne by a free
people."

In 1824 a statute of New Jersey gave to riparian owners
the right to drive stakes in the waters of the bay, in front
of their lands, to which to fasten nets, they not interfering
with the navigation or any fishery.   Waddell drove stakes
accordingly, within the lines of a several fishery thereto-
fore granted by the proprietors, and Martin, the grantee
of the fishery, brought ejectment.   The cause resulted as
did *Arnold v. Mundy,* and reached the supreme court of

the United States in 1842, where it was affirmed. The question here was, as in all cases of ejectment, upon the strength of plaintiff's title, and had no bearing whatever upon any riparian rights of the defendant; nor did the fact that the defendant had a license from the state cut any figure in the decision, and the result would have been the same without it. The court said: "From the opinion expressed in *Blundell v. Catterall*, 5 Barn. & Ald. 287, and in *Duke of Somerset v. Fogwell*, 5 Barn. & C. 883, the question whether since *Magna Charta* the king could grant to a subject a portion of the soil covered by the navigable waters of the kingdom so as to give him an immediate and exclusive right of fishery, either of shell fish or floating fish, within the limits of his grant, must be regarded as settled in England against the right of the king." The case of *Willson v. Marsh Co.*, 2 Pet. 245, decided in 1829, merely held that, in the absence of congressional legislation, the state of Delaware could authorize the damming of an inconsiderable, sluggish creek for the purpose of facilitating the owners of its marshy shores in reclaiming them, so that the health of the community could be bettered; and that a citizen of another state could not complain of the obstruction. *McCready v. Virginia*, 94 U. S. 391 (1876), decided that a state held the tide waters, and the fish in them, for its own people, and not for the people of another state, and that a statute prohibiting the citizens of any other state from taking the fish was, "in effect, nothing more than a regulation of the use by the people of their common property," and therefore no denial of the constitutional right that the citizens of each state have to all the immunities and privileges of citizens of the several states. *Barney v. Keokuk*, 94 U. S. 324, confirmed the claim of the state of Iowa to the title of the Mississippi to high water mark; but, as the main point in the case, held that one who has dedicated a street parallel to navigable

water cuts himself off from riparian ownership, and yields
to the public, in this instance the city of Keokuk, the right
to wharf out as an incident of the public use of the street.
Barney's contention was that, as owner of the land to the
middle of the river, his dedication only extended to the
water's edge, and that the filling beyond that line was a
trespass on his land.

It will be seen from the opinion of the court here that
its decision is based mainly upon these United States su-
preme court cases. It is worthy of remark that they have
not been so interpreted in any but a very small minority
of the states; and the supreme court itself has never in a
single instance based its ruling in a case, where the ri-
parian right of wharfage was in issue, upon any state statute
or ascertained custom or usage. In its most clearly cut
decision, *Yates v. Milwaukee,* no such interpretation was
allowed to interfere with its declaration of a riparian right
of wharfage in Yates, although he was contending, not only
against the city of Milwaukee, but against the state of Wis-
consin, which had chartered the city to regulate the wharves
on her water front, and herself to build and maintain such
aids to navigation at the ends of streets. In *Weber v. Com-
missioners,* 18 Wall. 57, notwithstanding the language
quoted by the court in its opinion, Judge FIELD distinctly
and broadly announced the adherence of the supreme court
to the doctrine of *Yates v. Milwaukee,* and showed that
Weber was not a riparian owner. It is worth remember-
ing, at this point, that San Francisco was the successor of
a Mexican pueblo, and that the municipal corporation was
the owner of all the land to high water mark; so that when
the State of California fixed the harbor line, and surren-
dered the tide lands within it to the city, it was making
the surrender to a riparian owner. *Hart v. Burnett,* 15
Cal. 530.

Inasmuch as the cases above noted are chiefly relied upon

to overcome the force of *Dutton v. Strong, Yates v. Milwaukee,* and *Railroad Co. v. Schurmeir,* and as none of them involved the matter here in issue, I will briefly allude to these three cases, which it is agreed do touch the point. It is urged that there was a difference between the fresh water rules and the salt water rules; or that the upland owner had already built his wharf, presumbly under state license; or that there was some unmentioned statute on which the court was relying, etc. But if any such elements did enter into the consideration of those cases, the published decisions, from syllabus to signatures, including briefs of counsel, fail to note the fact. Their declarations are broad and general, and, if we may rely on anything in judicial decisions, we ought to be able to do so here. Each of the cases was quoted in the succeeding ones, and all have been cited often and again by the supreme court, and by almost every federal and state court. *Yates v. Milwaukee* is the leader, and that was a case in which the state's authority was indirectly, but very materially, in question. So in *Railroad Co. v. Schurmeir,* the defendant had the state's title to the land over which the plaintiff claimed to exercise his right of access. Since those decisions there is, I believe, not a single case in the federal or state reports where the principles therein laid down are doubted or departed from. On the contrary, they have been often cited, always to the effect contended for here, and to the frequent overruling of contrary holdings. It is the same with the law-writers who have embraced this subject in their works, with a single exception. I mention this, not as arguing that numbers make the law, but to show that the profession has not understood those decisions to have been pronounced with any of the qualifications and reservations insinuated here; and I conclude with the proposition, taken from these cases, and never denied by the supreme court of the United States, that a riparian owner on the sea shore has a natural

right of access, and a right to construct a landing, wharf or pier for his own use, or for the use of the public, which is a vested, right or appurtenance to his land under the common law of real property as it exists in the United States, without any reference to statutory license or customary usage.

In support of this position I cite Ang. Tide Waters, 24 *et seq.,* 224 *et seq.;* Cooley, Const. Lim. (5th ed.), p. 675, note 1; Ang. Water Courses (7th ed.), 732; 3 Washb. Real Prop. (5th ed.), 445; Gould, Waters, §§ 148–154; Lewis, Em. Dom., §§ 77–83; Dill. Mun. Corp. (4th ed.), § 106; Washb. Easem. (4th ed.), 324; Houck, Rivers, §§ 280, 281; 6 Amer. & Eng. Enc. Law, 558; 28 Myer's Fed. Dec., tit. "Riparian and Littoral Proprietors"; 3 Kent Comm. (13th ed.), p. 413, note; Kerr, Inj., pp. 264, 265. Mr. Wood, in his Law of Nuisances, is, I believe, the only modern text-book writer who maintains the opposite ground. But this author does not attempt to misconstrue *Yates v. Milwaukee,* or find excuses for this ruling. On the contrary, he attacks it boldly, characterizing the language of it as "mere *dictum,*" and declares the principle established by it as "wholly unsustained by any authority." We are not accustomed to thus lightly treat decisions of that great court, but the attack thus made is admirable for its audacity. *Lyon v. Fishmongers' Co.,* 17 Moak, Eng. R. 51, is also explained away by this court as never before. Mr. Wood found no explanation. He quotes at length from the opinions of Lords Cairns, Chelmsford, and Selborne, and then says:

"Thus it will be seen that there is considerable conflict upon the question discussed in the note, but, while we believe that the doctrines advanced in this case are utterly fallacious, and unsustained in principle as they are upon authority, it will not be profitable to pursue the matter further; but, as it is the business of an author to give the law as he finds it, I have felt constrained to give the lead-

ing portions of the opinions of the lords justices in the case, that the question may be fairly presented."

I take it that the author "gives the law as he finds it" when he quotes the opinion of the two highest courts of the civilized world, although he personally does not agree with the correctness of their decision.

The court assumes that inasmuch as many of the states have long had statutes regulating the riparian owner's exercise of his right of wharfage, and in many instances enlarging it, therefore his right rests entirely upon the statute of his state. I do not see why it should be so regarded, since we constantly find what has always been the law enacted into statutory form; and we might as consistently say that the state's title to the tide and shore lands is dependent solely upon article 17 of the constitution. It is sufficient to say that the courts of the states alluded to have not taken any such position, and I shall now cite some cases showing this to be the fact. One of the oldest of these statutes is that of Maryland, in 1745; but in *Railroad Co. v. Chase*, 43 Md. 23, the court said: "These riparian rights [of accretion and wharfage], founded on the common law, are property, and are valuable; and, while they must be enjoyed in due subjection to the rights of the public, they cannot be arbitrarily or capriciously destroyed or impaired. They are rights of which, when once vested, the owner can only be deprived in accordance with the law of the land, and, if necessary that they be taken for public use, upon due compensation;" citing *Yates v. Milwaukee*. In New York, although for many years the courts have been handicapped by *Gould v. Railroad Co.*, as a settled rule of property, in *Mayor, etc., v. Hart*, 95 N. Y. 443, the court said:

"But it shocks every notion of justice and right to say that the riparian owner upon navigable water has no equities by reason of that ownership. It is a doctrine which

is repudiated by the entire legislation of our own state. .
。 。 And whenever and wherever the state has granted
to the city of New York exterior lands, under water, it has
accompanied the grant with pre-emption rights to the ad-
jacent owners. It is idle to say that all this has been done
of pure grace, and without any equity in the abutters.
There was reason for doing it, and justice in the act.
Granting, as has been held, that the riparian owner has no
legal or equitable right enforceable as such against the pub-
lic right, it is nevertheless true that out of his situation
upon the bank, and the convenience and benefit of the
water front, he suffers peculiar damage and individual in-
jury when cut off by the public use."

If stronger language was needed to show that the New
York court of appeals would now overturn *Gould v. Rail-
road Co.* if it could, it is to be found in *Rumsey v. Railroad
Co.*, 114 N. Y. 423 (21 N. E. Rep. 1066, and 25 N. E. Rep.
1080). Rhode Island has always maintained the doctrine
contended for without reference to any statute. *Providence
Steam Engine Co. v. Providence, etc., S. S. Co.*, 12 R. I. 348
(34 Am. Rep. 652); *Clark v. Peckham*, 10 R. I. 35. Con-
necticut in like manner. *Simons v. French*, 25 Conn. 346;
*State v. Sargent*, 45 Conn. 358. This case contains an emi-
nently fair discussion of the powers of the state. In New
Jersey the courts maintained the rule until *Stevens v. Rail-
road Co.*, 34 N. J. Law, 532 (3 Am. Rep. 269) (see *Keyport,
etc., Co. v. Farmers' Transp. Co.*, 18 N. J. Eq. 516; *Gough
v. Bell*, 22 N. J. Law, 441; *Bell v. Gough*, 23 N. J. Law,
624), when in a long discussion, not in any wise necessary to
the decision of the case, the court announced that riparian
owners had no rights which could be injured by the state, but
at the same time sustained a judgment for injuries of precisely
the character discussed, in all essential parts. The decision
on the main point, for which the case is celebrated, was
based on the English case of *Duke of Buccleuch v. Board
of Works*, L. R. 5 Exch. 221, which was reversed after-
wards in the house of lords (L. R. 5 H. L. 418), and still

further overthrown by *Lyon v. Fishmongers' Co.*, 17 Moak, Eng. R. 51, on the very point relied on. The legislature of New Jersey immediately amended the wrong done by this decision by its act of 1869. *Tinicum Fishing Co. v. Carter*, 61 Pa. St. 21 (100 Am. Dec. 597), says:

"The state can grant authority to make such erections [of structures below high water] either to the riparian owner or to others, so long as the riparian owner is not thereby deprived of access to and the use of the river as a public highway, which is implied, if not expressed, in the grant to him of land bounded on the stream."

In North Carolina, *Bond v. Wool*, 107 N. C. 139 (12 S. E. Rep. 281), is the latest of several cases on this subject, and there the court said:

"In the absence of any special legislation on the subject, a littoral proprietor and a riparian owner, as is universally conceded, have a qualified property in the water frontage belonging by nature to their land; the chief advantage growing out of the appurtenant estate in the submerged land being the right of access over an extension of their water fronts to navigable water, and the right to construct wharves, piers or landings, subject to such general rules and regulations as the legislature, in the exercise of its powers, may prescribe for the protection of the public rights in rivers or navigable water."

It will be said that the phrase, "in the absence of any special legislation on the subject," means, "unless there be special legislation otherwise;" but it is not so. The sense is, "without any legislation to that effect," and the decision shows it. *Bond v. Wool* is supported by decisions in other states, old and new, in numerous cases, of which I mention one or more in each, viz.: In Michigan: *Rice v. Ruddiman*, 10 Mich. 125; *Lincoln v. Davis*, 53 Mich. 375 (51 Am. Rep. 116; 19 N. W. Rep. 103). In Indiana: *Bainbridge v. Sherlock*, 29 Ind. 364 (95 Am. Dec. 644). In Wisconsin: *Delaplaine v. Railroad Co.*, 42 Wis. 214 (24 Am. Rep. 386). In Minnesota: *Brisbine v. Railroad Co.*, 23

Minn. 114. In Missouri: *Meyers v. St. Louis,* 8 Mo. App. 266, affirmed, 82 Mo. 367. In Illinois: *Railroad Co. v. Stein,* 75 Ill. 41. In Kentucky: *Thurman v. Morrison,* 14 B. Mon. 367. In Ohio: *Hickok v. Hine,* 23 Ohio St. 523 (13 Am. Rep. 255). In Arkansas: *Organ v. Railroad Co.,* 51 Ark. 235 (11 S. W. Rep. 103), and cases cited. In California: *Shirley v. Bishop,* 67 Cal. 543 (8 Pac. Rep. 82). In Oregon: *Wilson v. Welch,* 12 Or. 353 (7 Pac. Rep. 341); *Parker v. Packing Co.,* 17 Or. 510 (21 Pac. Rep. 822).

Of these states, at least Missouri, Kentucky, Arkansas, North Carolina, California and Oregon stop the upland title at high water mark. Cases to the same undoubted effect in the United States courts are: *Bowman v. Wathen,* (Ind.) 2 McLean, 376; *Packet Co. v. Atlee,* (Iowa) 2 Dill. 479; affirmed, 21 Wall. 389; *State v. Railway Co.,* 33 Fed. Rep. 730; *Hollingsworth v. Parish of Tensas,* 17 Fed. Rep. 109, 113; *Rutz v. St. Louis,* (Mo.) 3 McCrary, 261; *Transportation Co. v. Parkersburg,* 107 U. S. 699 (2 Sup. Ct. Rep. 732); *Potomac Steam Boat Co. v. Upper Potomac Steam Boat Co.,* 109 U. S. 672 (3 Sup. Ct. Rep. 445). In *Van Dolsen v. Mayor,* 17 Fed. Rep. 817, decided in 1883, the facts were precisely those of the case at bar, and after considering all of the cases, both English, state and federal, the court holds that the New York elevated railroad cases are decisive of the law in that state, since there is no difference between the principles applying to the landway and the waterway; and, further, that in view of *Yates v. Milwaukee, Lyon v. Fishmongers' Co.,* and other like cases, *Gould v. Railroad Co.,* 6 N. Y. 523; *Stevens v. Railroad Co.,* 34 N. J. Law, 532 (3 Am. Rep. 269); *Lansing v. Smith,* 4 Wend. 9 (21 Am. Dec. 89), and *Furman v. Mayor, etc.,* 10 N. Y. 567, are no longer to be regarded as controlling. There the lessee of the riparian owner sought an injunction to prevent the city of New York, which was the owner of the land between high and low water, from filling up the

flat and obstructing the way, and was held to be entitled to the relief asked.

This court, I think, misreads the case of *Lyon v. Fishmongers' Co.,* when it gives importance to the term "privilege," as though the right sustained in Lyon were a concession of statute or usage merely. On the contrary, each of the lords who delivered an opinion was pronouncedly clear that the right was by nature. Said Lord SELBORNE:

"The rights of a riparian proprietor, so far as they relate to any natural stream, exist *jure naturæ,* because his land has by nature the advantage of being washed by the stream; and, if the facts of nature constitute the foundation of the right, I am unable to see why the law should not recognize and follow the course of nature in every part of the same stream. ... Even if it could be shown that the riparian rights of the proprietor of land on the bank of a tidal navigable river are not similar to those of a proprietor above the flow of the tide, I should be of the opinion that he had a right to the river frontage belonging by nature to his land, although the only practical advantage of it might consist in the access thereby afforded him to the water, and the right of navigation common to him with the rest of the public. Such a right of access is his only, and is his by virtue and in respect of his riparian property; it is wholly distinct from the public right of navigation."

No other state court has interpreted this case and the opinions of the judges to mean anything but what they say; and a very high English authority, the Encyclopædia Britannica, cites the case in the concluding words of its article on riparian laws, in this way:

"It should be noticed that rights of the public may be subject to private rights. Where the river is navigable, although the right of navigation is common to the subject of the realm, it may be connected with a right to exclusive access to riparian land, the invasion of which may form the ground for legal proceedings by the riparian proprietor."

Says Judge Dillon, in his Municipal Corporations, § 106 (4th ed.):

"By the common law the riparian owner has the right to establish a wharf on his own soil, this being a lawful use of the land. The right is judicially recognized in this country, and riparian owners on ocean, lake or navigable river have, in virtue of their proprietorship, and without special legislative authority, the right to erect wharves, quays, piers and landing places on the shore, if these conform to the regulations of the state for the protection of the public, and do not become a nuisance by obstructing the paramount right of navigation. This right has been exercised by the owners of the adjacent land from the first settlement of the country."

The idea of "purpresture" furnishes forth a great difficulty in the mind of the court. There is a short and comprehensive history of that portentous institution in *People v. Davidson*, 30 Cal. 379, from which it appears to be not much more than an ancient prerogative ghost, whose original substance has been completely emasculated by the later law. Suffice it to say that whether the doctrine of purpresture, as applied to wharves extended by riparian owners, has any force in this country or not, it never, in its palmiest days, had the effect of permitting the king to shut off the riparian owner of land from access to the sea by an obstruction of any kind placed in the highway, which is the real ultimate point in issue in this case.

In conclusion, I recur to the act of 1854, to remark that if that act is to be taken as now repealed, and if riparian owners have not the natural right of access and wharfage, then there is not, in the State of Washington, any authority under which the slightest convenience can be erected or maintained in aid of navigation, excepting in front of incorporated towns; and all the accumulations of labor and wealth, already expended by private enterprise in building up a commerce second to none in present importance and

future promise, are laid at the mercy of a public policy which has not seen its equal since men began to "go down in ships." For what? To maintain an idea of "legal title" and royal sovereignty, which has been repudiated for generations, and which now at this day says to the common people of Washington: "The shores of your great inland sea, and of your hundred rivers, are walled in by the state until such time as, after survey, appraisement, contests, slow legislative proceedings and what not, the speculator on your necessities shall have loaded himself with tide land patents, and fattened with your fees for crossing his 'land.'" The simple logger may not roll the hard won product of his toil down the slope of his land and into the water, because some shrewd watcher of the land office has bought the shore while his back was turned. This is making the waters a public highway with a vengeance. But the illustration is just, because it refers to the very use made every day of our shores in hundreds of places without wharves, docks or piers, and where there is no question of purpresture, but only the right of access is availed of. It involves the principle of the case in homely, practical form. Conceiving that no such conclusions were necessarily involved in the constitution or the statute, I dissent from the idea that any such policy was intended to be adopted, even though it were lawful to do so.