# CHARLESTON.

RUTHERFORD *v.* RUTHERFORD.

Submitted September 10, 1903.—Decided February 16, 1904.

1. CONTRACT—*Release.*
   A release of one of two joint contractors releases both. (p. 59).

2. COMPROMISE—*Contract.*
   A compromise of a controversy is a valuable consideration to sustain a contract. (p. 60).

3 CONTRACT.
   Consideration of a contract. What is valuable. (p. 60).

4. CONTRACT—*Fraud.*
   A person who at the time of the execution of a release knows, or by inquiry might know, the exact nature of the writing, cannot invoke his own neglect to ascertain its nature to impeach it, unless imposed on and misled by fraud. (p. 62.)

5. RELEASE.
   A release of a mere personal obligation is not required to be recorded. (p. 62).

6. CERTIFICATE—*Recorded Instrument.*
   The certificate of acknowledgment of a writing not required by law to be recorded is no evidence of its execution, and is not admissible as such. (p. 62).

Appeal from Circuit Court, Randolph County.

Bill by John E. Rutherford against Wade H. Rutherford and others. Decree for plaintiff and defendants appeal.

*Reversed.*

W. B. MAXWELL, for appellants.

HARDING & HARDING, for appellees.

BRANNON, JUDGE:

John E. Rutherford by two separate deeds, 15th March, 1887, conveyed two tracts of land in Randolph county, one of seventy-five acres, one of ninety-five acres, to his two sons, Samuel W. Rutherford and Wade Hampton Rutherford in consideration, as provided in the deeds, that the sons would support and bury

John E. Rutherford and his wife. The wife of John E. Rutherford did not join in the deeds. She died in 1897. (It is said by counsel on both sides that John E. Rutherford was killed by a train of cars near Grafton since the decree in this case). At the date of said deeds Samuel W. Rutherford was nineteen and Wade H. Rutherford five years of age. Samuel W. Rutherford married and brought his wife to the home. Trouble in ways not necessary to be detailed here arose between the father and the son's wife, which engendered bad feeling between father and son. Samuel lent little or no help to his parents. Wade H. Ruthford still lived with his father, and lent him help for some years, when he left home, driven away, as he says, by his father. Amid these troubles, on 5th January, 1894, a writing was made which is so very badly drawn as to be almost unconstruable. John W. Rutherford says in his bill that finding it impossible to get along with Samuel W. Rutherford, he, the father, "attempted to enter into" this contract. So he moved it as a compromise. His bill says so. It names S. W. and W. H. Rutherford as its formal parties; but they and their father and mother all signed it. It imports that Samuel W. Rutherford was to deed W. H. Rutherford forty out of ninety-five acres, and keep the balance, and he·was to relinquish to W. H. Rutherford the seventy-five acres. It declares that it was a final settlement and released all responsibilities between the parties. The parties never conveyed under this contract. Samuel W. Rutherford and his father still differed. Later, April 3, 1895, a written contract appears, signed by John E. Rutherford and Samuel Rutherford, acknowledged before a notary and recorded, which recites that J. E. Rutherford had before that bound S. W. Rutherford to ·care for him and see him decently buried, and it released S. W. Rutherford from "all said incumberance and maintenance," and S. W. Rutherford was to turn over, to W. H. Rutherford one black mare, and the writing declared, "and this is a final settlement to this date between said parties of J. E. Rutherford, W. H. Rutherford & S. W. Rutherford." On the date of this contract Samuel W. Rutherford and wife made a deed to Wade H. Rutherford releasing his interest in the seventy-five acres, retaining a lien to require Wade H. Rutherford to convey to Samuel the ninety-five acres, Wade H. being then infant and unable to convey. On 16th December, 1896, Samuel W. Ruther-

ford conveyed the ninety-five acres to R. V. Shreve, and by deed 12th January, 1897, Shreve conveyed to David C. Simmons. On the 27th March, 1897, John E. Rutherford brought an equity suit in Randolph against W. H. Rutherford, Samuel W. Rutherford, Shreve and Simmons, alleging that his two sons had wholly failed to support him and his wife, as stipulated in the conveyance of said two tracts by him to his sons, and charging that the conveyances by Samuel W. Rutherford to Shreve and by Shreve to Simmons were made with fraudulent intent to defeat his rights, and asking the cancellation of the two deeds from himself to his sons, and the deed from Samuel W. Rutherford to Shreve, and that from Shreve to Simmons, and that said land be restored to him. In October, 1901, an amended bill was filed. The original charged default of support and abuse by Samuel W. Rutherford, but did not as to Wade H. Rutherford, but, on the contrary, admitted that Wade H. Rutherford had to some extent complied with his obligation. The amended bill charges that both sons had failed to support their father or mother, and had cruelly neglected both. This bill states the death of the mother. John E. Rutherford in his bill introduces the contract of release into the case, but denies that he signed, agreed to or acknowledged it. The answer of Samuel W. Rutherford relies upon it as a release. Wade H. Rutherford, being an infant, filed an answer by guardian *ad litem.* Shreve and Simmons filed answers denying all fraud on their part, denying any right in John E. Rutherford as still subsisting in the lands. Depositions were taken. The ninety-five acres was in woods,—Samuel cleared five acres. The other tract poor. The rental value only $15.00 or $20.00. On the hearing a decree was made cancelling the two deeds from John E. Rutherford to his sons, and the deed from Samuel W. Rutherford to Shreve and the deed from Shreve to Simmons. Samuel W. Rutherford appealed, and Wade H. Rutherford having reached majority after the appeal unites in it.

Concede that the sons did not comply with their obligation to support their father and mother. Did not John E. Rutherford release their obligation to do so? The parties had contention and difference about it, and they made the contract of compromise of 5th January, 1894. John E. Rutherford signed it. For what reason? His elder son was married and living

to himself, but the younger was still with his father. The father now depended on him, and he wanted him to have the seventy-five acres free from all claim on the part of Samuel W. The father lived on it—did so all the while, and from it he and the younger son could have a living. By this contract the younger son got the sole title to the seventy-five acres and forty acres out of the ninety-five acre tract. The father and son could look to both for bread. The father assented to this arrangement, because his bill says he moved the contract, and he signed it. The writing says that it was a final settlement and released all responsibilities between both parties. It was drawn by a very illiterate, incompetent hand; but it declares that it is final settlement of all responsibilities, and the father signing it, it could allude to nothing else, as to him, but the release of the obligation of Samuel W. Rutherford to support him.

By it the seventy-five acres was freed from claim by Samuel in favor of Wade, and Wade got forty acres of the other tract, and in consideration thereof the father forewent his demand for support. The release of Samuel operated to release Wade, because the release of one of two joint contractors releases both. 3 Minor's Inst. 213. Strife went on, and later comes the compromise contract of 3d April, 1895, releasing Samuel from all obligation of support, and its language further released Wade, in addition to the release by operation of law. But John E. Rutherford denies that he ever executed it, or that he thereby agreed to release. This denial is repelled by the fact that he did by this second compromise only what he did by the first, released support. I use that first contract to corroborate the probability that he did make the second compromise, because it only does, as to him, what the first did. We need not discuss how far the second abrogates the first, because as to John E. Rutherford they both do the same thing, that is, release the obligation of maintenance or support. What are the rights of the two sons under them, as between themselves, is not involved. It is said that this second contract is based on no consideration. In the first place, it was a compromise. That it had this character the bill shows, for it says that amid the difficulty the plaintiff attempted to make it. The evidence plainly shows it to be a compromise. If made, it surely was made, as bill and evidence show, as a compromise. That makes the consideration sufficient

and favored in law. *Zane* v. *Zane,* 6 Munf. 406. Compromise of a *colorable* claim is a valuable consideration. 3 Minor's Inst. 133. But, in addition, the same page shows that a valuable consideration is "a benefit to the party promising, or to a third person at his request, or an injury, loss, charge, or inconvenience, or the risk thereof to the party promised." Now, applying this law, John E. Rutherford got the benefit, and his son the loss, of a mare which by the contract was conveyed to W. H. Rutherford, at John E. Rutherford's request, as shown by the fact that he himself signed the contract, and when he was told by his son to come out of the house (where the contract was written) and get the mare, he told Samuel to deliver her to Wade. In further addition, at that same time Samuel made a deed to Wade for his interest in the seventy-five acres. John E. Rutherford was present and knew this. It was the same transaction. This was a consideration, as Samuel suffered a loss thereby. And this was to the expected benefit of the father, because he wanted Wade to have sole ownership of the 75 acres and the mare, that they both might have support from them. It is said that Samuel did not own the mare. He claimed her, had her in his sole possession, the evidence proves his right to her, and if not, it is sufficient to say that the contract treated the mare as his, and compromised conflicting claim to her.

But John E. Rutherford says he did not execute the contract.

Facts above stated render it highly probable that he did. The oral evidence added makes it clear that he did. It greatly preponderates to this conclusion. George L. Shreves says that a few days before the contract was made he met John E. Rutherford on the road and the trouble between him and his son Samuel was talked about, and Rutherford said he would release his life maintenance to Sam if he would give Hampton a certain black mare he had, and that he, Shreves, told Rutherford he knew Samuel would do so, if Hampton would take the lower tracts and give Samuel the upper, and Rutherford said he would do that. Shreves said that from this the contract and deed originated. So they did. The contract was but its result. When we know of this conversation, it is unreasonable to say that John E. Rutherford did not sign the contract. But by no means is this all. The parties all met soon after at a store. Ira Shockey drafted contract and deed, and as notary took and

certified the acknowledgment of the parties to them, among them John E. Rutherford. He swears that John E. Rutherford after the contract had been read to him, said his hand was so stiff that he could not sign it, and requested Shreves sign it for him, which he did. Shockey says the paper was read to him both before and after Rutherford signed it, and that he acknowledged it before him as notary. Shreves swears that he at Rutherford's request signed it for him. When asked if he was present when Rutherford acknowledged the paper, he said he was not sure, but thinks he was. Albert Skinner swears that he was present, and heard the contract read and acknowledged before the notary, and Rutherford made no objection to it. R. O. Zirkle swears that after the contract he asked Rutherford why he gave up his maintenance for the mare, and he replied that he would rather have the mare than nothing, thus admitting the contract. Against all this evidence alone stands Rutherford's oath denying that he signed or authorized the signing of the contract, by general language. True, there is a George W. Skinner, who says he was present when the contract was drawn, and that Rutherford did not agree to it, and that he did not in his presence ask any one to sign for him. This can be plausibly explained in this way. Wade H. Rutherford was an infant, and in the deed to him from Samuel for the latter's interest in the seventy-five acres Samuel retained a lien to secure the conveyance to him by Wade when twenty-one of the ninety-five acres. Against this lien Shockey says that John E. Rutherford raised objection, and John E. himself states so, and according to both Shockey and Rutherford that was his only objection. That was not an objection to the contract, but to the deed. The lien was reasonable, and Shockey says that when fully explained to Rutherford he was satisfied. It lends aid to all the above when Rutherford admits that he did tell Samuel he would yield the forty acres which by the first contract Samuel was to concede Wade out of the ninety-five acres, if Samuel would give up the mare. It shows he agreed to the second contract. Thus we find that that release contract was made. We cannot annul solemn written instruments by mere arbitrary will, or sympathy or prejudice. People ought not sign them, if they do not assent. One who signs a document cannot say he did not understand its import or effect. If he knows, or by in-

quiry might know, its nature, he cannot invoke his neglect to impeach it by calling his own neglect some one else's fraud. *Dixon* v. *Wilmington,* 1 Am. & Eng. Dec. in Eq. 110; Bishop on Contracts s. 346; *Spitze* v. *B. & O. Co.,* 32 Am. St. R. 378. The plaintiff in his bill and evidence says he cannot read or write, thus intimating that he did not know the contents of the contract; and so the law just given would apply; but it is not needed, because his bills say that though he could not read, still he ascertained fully the nature of the paper, and disagreed to it. So he states as a witness. He does not plead ignorance of the paper, but throws himself in the face of four witnesses and circumstances confirming them by simply declaring he did not sign the paper. He cannot plead infirmity of age. He was but fifty-five when he made the deeds, and sixty-three when he made the releases.

These views render it unnecessary to consider whether the sons did their duty. But it may be said that the father could not expect much when he conveyed the land to mere children. And he was very quarrelsome and hard to please. His son Samuel swears he drove him away by calling his wife vile names. The other son swears his father drove him from home, threw his clothes into the yard, told him to leave, only because jealous of his attention to a woman living with them.

It is proven that Samuel told his father that his door was open to him, to come and he would be welcome. So, it reasonably appears that the father was not blameless. But investigation of this is useless. The father originally conveyed the land to his sons to avoid an expected demand against him, according to his own evidence, and this would forbid relief to him in a court of equity. Counsel raises the legal question whether the release is a recordable paper by suggesting that as it is its acknowledgment cannot be denied, on principles given in *Pickens* v. *Knisely,* 29 W. Va. 1. The obligation of support is only a personal one. No lien is retained in the deeds for its performance. The release is not a paper required to be acknowledged and recorded by Code, chapter 74, section 5 of chapter 76. No statute is cited to sustain the suggestion. If a paper is not one required to be recorded, or though it is, if it is not so certified as to acknowledgement as to authorize it to be recorded, the recordation has no legal force, and hence the certi-

ficate of acknowledgement is not evidence to prove the execution of the paper, and it can be denied. The certificate is hearsay and not competent evidence. 24 Am. & Eng. Ency. L. 141; Carr, J., in *Ben v.Peele*, 2 Rand. p. 543; *Braxton* v. *Bell*, 92 Va. 229; *Lee* v. *Tapscott*, 2 Wash. 280; *Fleshman* v. *Holman*, 27 W. Va. 728.

Decree reversed and suit dismissed.

*Reversed.*