Title Guarantee and Trust Company and Others, as Executors, and Trustees of the Last Will and Testament of James Jennings McComb, Deceased, Appellants, *v.* New York Juvenile Asylum, Respondent, Impleaded with Ida E. Brown.

First Department, July 13, 1909.

Real property — parol agreement to give easement — when unenforcible — purchaser on foreclosure takes no rights under promise subsequent to mortgage — estoppel — trust — notice to one of several trustees.

Suit for an injunction restraining the defendant from using a sewer on the plaintiff's property. It appeared that the plaintiff's testator, a former owner of the lands, had, in consideration of the settlement of the claims of a third party against the defendant's predecessor in title, agreed to grant said predecessor a certain right of way over his lands, which agreement was carried out by the execution and delivery of a deed of the right of way and a release of said claims. The defendant's predecessor, a realty company, in which the testator was interested, owned lands adjoining that of the testator, and proposed to lay out the property with streets and avenues and construct houses thereon. After the granting of the right of way aforesaid and after the execution of a mortgage by the realty company covering all its lands, said company requested the testator to allow it to build a sewer connecting the property to be developed with a sewer already built upon the testator's lands. To this the testator finally gave oral consent, but although a branch sewer running to the lands of the realty company was built, its plan of exploiting the property was never carried out, nor was any instrument executed by the testator creating an easement in the sewer. Thereafter the mortgage given by the realty company was foreclosed and the property bought in by the defendant, a juvenile asylum, which now seeks to discharge sewage through the sewer constructed by the testator, claiming an easement therein and asking that the testator's executors and trustees specifically perform the oral agreement by delivering a deed granting a perpetual right to use said sewer.

Evidence examined, and *held*, that the sole consideration for the release of the claims aforesaid was the granting of the right of way, and that the right to use the sewer on the testator's property was conditioned wholly upon the carrying out of the scheme to develop the lands, and that as the same had been abandoned and the lands sold under a mortgage executed prior to the oral agreement, such agreement created solely a privilege or license in favor of the realty company, which terminated on its failure to carry out the building scheme, and not a perpetual easement which passed to the purchaser on foreclosure.

A verbal contract to give an easement is enforced only where it is conclusively proved and where one party has acted on it with the knowledge of the other

**530** TITLE GUARANTEE & TRUST CO. *v.* N. Y. JUVENILE ASYLUM.

First Department, July, 1909. [Vol. 133.

party, so that the principle of estoppel justifies a court of equity in enforcing the agreement.

As the alleged agreement of the testator to give an easement in his sewer was made subsequent to the execution of the mortgage under which the defendant acquired title, the sewage rights, if any, did not pass.

Although one of the testator's trustees was given notice of a contract between a grantee of the testator and said purchaser on foreclosure providing for the use of the connecting sewer, and although such trustee made no objection, the trust estate being held by several trustees was not bound by the notice to one of them.

MCLAUGHLIN and HOUGHTON, JJ., dissented, with opinion.

APPEAL by the plaintiffs, the Title Guarantee and Trust Company and others, as executors, etc., from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on the 28th day of March, 1908, upon the decision of the court rendered after a trial at the New York Special Term.

*George A. Strong*, for the appellants.

*Augustus N. Hand*, for the respondent.

INGRAHAM, J.:

This action was brought to obtain an injunction restraining the defendant the New York Juvenile Asylum from using a sewer through the plaintiffs' property and from maintaining any connection with it for any sewer belonging to or used by said defendant, and from discharging into it any sewerage from the property owned and occupied by said defendant. The complaint alleges that one James Jennings McComb during his life was the owner of certain property at Dobbs Ferry in the State of New York; that McComb died on the 31st of March, 1901, leaving a last will and testament by which he gave and devised such real property to the plaintiffs as trustees; that McComb constructed a private road through his property, known as Walgrove avenue, and under said road constructed a private sewer for the purpose of draining his property and for the use of residences erected thereon; that in September, 1901, the plaintiffs, as executors and trustees of McComb, conveyed a portion of the property owned by McComb during his life to the defendant Ida E. Brown, she being entitled to use this private road

and private sewer thereunder for the property that she purchased from the plaintiffs, and to connect the drainage from her building erected on the property so purchased with this private sewer; that the defendant the New York Juvenile Asylum had purchased a tract of land adjoining the property of McComb and had entered into a contract with the defendant Brown by which it proposes to make a connection with the sewer on Brown's property which connects with the private sewer through the plaintiffs' property by which the sewerage from a large public institution to be built upon the premises acquired by the defendant the juvenile asylum will be carried away; and it was to enjoin this use of the sewer through the plaintiffs' property that this action was brought.

The defendant in answer to this complaint alleges that prior to the death of McComb the Chauncey Realty Company was the owner of a large tract of land situated to the south of the McComb tract; that McComb was a stockholder in the said company and that the company undertook to lay out the property with streets and avenues, contemplating the construction of houses and a club house thereon; that prior to the 1st of December, 1899, McComb had constructed under Walgrove avenue through his premises a sewer, and that between the 1st day of December, 1899, and the 1st day of March, 1900, McComb agreed with the Chauncey Realty Company that if the company would settle and discharge certain alleged claims of one Wood or his estate against Erhardt and others interested in the Chauncey property he would grant to said company an easement in perpetuity to use Walgrove avenue as described in the complaint herein as a right of way and to connect with and use the sewer mains thereunder, and would extend said Walgrove avenue to connect with the roads to be built by the company upon its premises; that the Chauncey Realty Company settled the claims of Wood, and thereafter, in reliance upon this agreement of McComb, the Chauncey Realty Company used said Walgrove avenue as a right of way and connected with and used said sewer mains under said Walgrove avenue, and that or its successors in title are still connected with and still using said sewer mains for the purpose of draining said property then owned by the said company; that said Chauncey Company and this defendant have performed all the conditions, covenants and agreements of this agreement between

McComb and the said company to be performed on the part of said company, but that McComb and these plaintiffs have failed to perform the covenants and conditions of said agreement to be performed by plaintiffs' testator by failing to execute and deliver to said company or to this defendant a good and sufficient deed granting and conveying a perpetual easement to use Walgrove avenue as a right of way and to use the sewer mains under Walgrove avenue; wherefore, the defendant the New York Juvenile Asylum demands judgment that the complaint be dismissed, and that the plaintiffs be decreed specifically to perform the agreement between plaintiffs' testator and the Chauncey Realty Company by delivering a good and sufficient deed conveying and granting to this defendant a perpetual right of way over Walgrove avenue and the right to use the sewer mains thereunder.

Upon the trial at Special Term the court found : " That between the first day of December, 1899, and February 20th, 1900, said James Jennings McComb agreed with said Chauncey Realty Company that if said company would settle and discharge certain claims of the estate of John P. Wood, the brother-in-law of said James Jennings McComb, against Joel B. Erhardt and others interested in the Chauncey property, which were then in suit, by delivering to Mary Esther McComb, the wife of James Jennings McComb, and sister of said Wood," certain satisfaction pieces of mortgages, and deliver a note of the Chauncey Company for $2,000 to said administratrix of Wood, " he, the said James Jennings McComb, would grant and convey to the Chauncey Realty Company for the benefit of its said lands an easement in perpetuity to use Walgrove avenue and the sewer mains thereunder, and also to extend said mains from the terminals thereof, and to extend Walgrove avenue in a southerly direction through his property into the lands of the Chauncey Realty Company, and to use said sewer and roadway extensions, and would also grant and convey to the Chauncey Realty Company a right of way over his property known as the Alpine Drive Turn." It was further found that the Chauncey Company subsequently delivered the satisfaction pieces to the administratrix of Wood, and also a note of the Chauncey Company for $2,000, and received from the said McComb a deed of the easement known as the Alpine Drive Turn.

I think the finding that McComb made any such agreement as is

specified in this finding is without evidence to sustain it. Some time prior to December, 1899, the Chauncey Company had acquired a large tract of land adjoining McComb's property, which it had undertaken to develop by the laying out of streets, roads, plots of ground for the erection of private dwellings, and a club house. McComb was a stockholder in this company, owning about 66 out of 5,000 shares. As he was the owner of a large tract of adjoining land, he was naturally interested in the development of the company's property. The real property acquired by the Chauncey Realty Company was subject to a large. mortgage, was evidently producing no income, and the success of the enterprise depended upon the company's being able to dispose of property to those desiring to build suburban residences. It would seem that one Wood, who was a brother of McComb's wife, had been employed by the company, and upon his death there was a dispute between the company and Wood's representatives, the company claiming mortgages upon certain property left by Wood, and Wood's representatives claiming that the company was indebted to Wood in an amount exceeding those mortgages. The realty company had employed a civil engineer named Lamb to lay out and design improvements upon the company's property and to build water and sewer works. At that time the property of the company was idle and Lamb made a map of the property. Lamb was called as a witness for the defendant and testified that in the first part of the year 1900 he had an interview with McComb, and asked McComb " for the privilege of connecting with this sewer and for the right of way for a roadway through his property, and he (McComb) stated he would make no concessions, grant nothing to the Chauncey Realty Company; that they had treated him shamefully, or rather his relatives shamefully. He would do nothing for them." Lamb made a report to the company of the result of this conversation, although to whom he made the report is not stated. Shortly after he again called on McComb and asked him, " if the wrong that he claimed against his relatives were righted, if he would give me, or give the company, the rights that I requested, and he said that if the mortgages were satisfied and the claims of the Wood estate was* satisfied, cash paid

---

*Sic.*

for it, that he would give me these easements that I requested, and the right of way through the property, or give the company such." Lamb reported this fact to the company, and subsequently he was appointed a committee with a Mr. Sweny to wait upon McComb to see if he would accept notes instead of cash and the release of the mortgages in consideration of the rights that Lamb requested; that McComb said he would give the rights of way and the use of the sewer in consideration of the company's paying or giving the notes for the Wood account and to cancel the two mortgages; that the amount of the note should be $2,000. He did not say anything about making a conveyance. The witness further testified that at a subsequent time he appointed a Mr. Kidney to go with the witness and point out the place where the old sewer left off; that in a conversation with McComb the witness agreed to put Y's in each of the places where he had located a sewer main. Subsequently the witness, built 2,315 feet of sewer, which ran from where McComb's main sewer stopped, through his property in a southerly direction to the north of the land of the Chauncey Realty Company, and that sewer cost between $1,600 and $1,800, in which was included $400 or $500 for superintendence. That sewer was all built inside of the McComb property, except about twenty feet, which extended into the property of the Chauncey Realty Company. At the time McComb was alleged to have made this promise, he stated that he supposed Mr. Sweny would take care of the papers in the matter. Subsequently the witness said that at the conversation when the settlement was made he asked for a right of way through McComb's property for an alpine drive, as well as the right to construct sewers from the end of his land up to the company's property, in consideration of the release of the two mortgages and the giving of the note for the Wood claim, and that that was the settlement effected that night. He was then asked whether there was anything said as to the character or duration of this easement, and replied that McComb said he would give a perpetual easement. On cross-examination he said he had four interviews with McComb. The first time he was by himself; the second time he had with him a Mr. Fish; the third time he had with him a Mr. Sweny, and the fourth time he was by himself; that Mr. McClelland was present at the time Sweny was with him, and nobody else at any of the

interviews; that at the first interview Lamb explained the extensive
improvements that the company intended to make, that these
improvements would help McComb's property and the drive would
be an advantage to him, and that the advantage of the improve-
ments upon the company's property to the property of McComb
was impressed upon McComb as a reason why he should grant these
rights to the company; that nothing was done at that time about
putting the agreement in writing; that it was all left in conversa-
tion, but it was stated that Sweny would take care of the papers in
the matter. The witness also testified that the Chauncey Realty
Company was engaged in laying out a residential property and was
to build houses and also a club house; that these houses were to be
country places, each with its own land around it; that the plots
would vary but were laid out in plots of 100 feet square; that the
prospectus anticipated a lot of very fine houses, and McComb was
told that the connection with the sewer was for the purpose of the
Chauncey scheme; that a sewer connection would help carry
through the Chauncey Realty Company's scheme, and that view was
presented to McComb, who expressed his approval of it; this scheme
seemed to appeal to him. All that was ever done in relation to this
Chauncey Company scheme for the property was to build this sec-
tion of sewer. Immediately afterward the mortgage upon the
property was foreclosed and then the whole scheme was abandoned;
no plots were sold; nothing further was done. What McComb
was asked to do was to give a right to connect his sewers with the
residences to be erected by the Chauncey Company upon its prop-
erty, and the right that was given, as found by the court, was lim-
ited to the inside of these houses. It was contemplated that the
agreement, whatever it was, was to be evidenced by deed or written
instrument. The testimony as to these conversations shows how
indefinite they were as to the rights that were to be acquired by
the Chauncey Company. There was not, however, one word said
to indicate an agreement that an easement was to be appurtenant to
the property, as distinguished from a license or personal right to the
Chauncey Company, which was to be granted for the purpose of
aiding in the development of its scheme of improvement. The
conversation was all based upon the particular kind of development
or improvement of the property then contemplated by the Chauncey

Company, and it was solely in connection with this improvement and development that the privilege, license or easement, whatever it may be called, was agreed to.

A Mr. Fish, who was present at one of these interviews between Lamb and McComb, testified as to the conversation in relation to the proposed development of the Chauncey Company's scheme, and the great advantage that that would be to McComb's property was insisted upon. Fish says that what McComb said was that if Lamb could adjust these other matters in relation to the Wood claim he would grant this concession, the details to be subject to the approval of Mr. Kidney. But all that was said was based upon the fact that aiding the development of the Chauncey Company's property would be a benefit to McComb's property, and there was nothing granted or agreed to be granted except a right or privilege to aid in this proposed development of the company's property. I think the fair inference from all the conversations was that what was granted was conditioned upon the carrying out of this development, and the right that was agreed to was to enable the Chauncey Company to carry it out. But, as before stated, it was clearly contemplated that whatever rights were to be given were to be settled by the interchange of written instruments, and when this settlement came to be carried out there was such an exchange of written instruments.

Mr. McClelland, who was employed by McComb to act as his attorney in relation to the final settlement in relation to the Wood matter with the Chauncey Company, testified that an action had been commenced against the Chauncey Company by Wood's administratrix to recover upon what was considered to be the amount due the Wood estate from the Chauncey Company; that after these discussions between Lamb, Fish and McComb, under that retainer and as representing McComb, he called upon Mr. Vedder, the president of the Chauncey Realty Company, and had two or more interviews with him; that propositions and counter-propositions were made, and ultimately a settlement effected by which the claim of the Wood estate against the Chauncey Company was settled, and what the Chauncey Company had demanded from McComb was obtained as the consideration for that settlement. McClelland testified that after several interviews with Vedder he came to an understanding

with him for a settlement of the Wood claims, and what McComb was to give the Chauncey Company in consideration thereof. These were reported to McComb and finally accepted by him, and that arrangement was carried out. The releases between the Wood estate and the Chauncey Company were exchanged, and McComb executed a grant to the Chauncey Company for an easement for a right of way over what was called the Alpine Drive, and there was attached to this deed a map showing the right of way granted. Upon this final arrangement nothing was said about this easement for a sewer, but the settlement as represented by the exchange of these instruments was the result of the negotiations between McComb's lawyer and the president of the Chauncey Company subsequent to the understanding between Lamb and McComb, and it seems to me that this settlement must be considered as the final settlement of the terms agreed to between the parties. The Chauncey Company satisfied the mortgages and gave its promissory note for $2,000, which apparently was never paid as it was produced upon the trial by the plaintiffs, and McComb executed and delivered the grant of a right of way over the Alpine Drive. The arrangement that was finally carried out as the result of these negotiations as to what should actually be granted by McComb as a consideration for the settlement of the Wood claim was stated by Mr. McClelland to be: " The transaction was that certain mortgages were to be canceled by the Realty Company, this note was to be given to Mr. McComb, or the claim was to be released, and Mr. McComb was to give or grant a right of way. That is the arrangement I made, which was carried out to my knowledge. There was no arrangement, or condition, or part of that arrangement other than that. The entire arrangement, as I made it with Mr. Vedder, was carried out on that occasion in the way I have described. Absolutely closed. Mr. Sweny and Mr. Lamb, I think, were present at the same time in Mr. McComb's house." And McClelland swore positively that there was nothing said about a sewer in that connection; that this sewer connection formed no part of the settlement between the Chauncey Realty Company and the Wood estate; that he conducted the negotiations and was there at the closing, representing both Mr. and Mrs. McComb, and he conducted all the negotiations.

**538**   TITLE GUARANTEE & TRUST CO. *v.* N. Y. JUVENILE ASYLUM.

First Department, July, 1909.          [Vol. 133.

Mr. Sweny, who was a member of the committee with Lamb in his interviews with McComb, testified that he drew the deed from McComb to the Chauncey Realty Company for a right of way over Alpine Drive; that he drew the satisfaction pieces for the mortgages and releases of the Wood estate and the note for $2,000, and that he was present at the time the transaction was finally closed and these instruments delivered; that he was present at the time of the interview between McClelland and McComb; that the whole matter was gone over and the papers examined that had been drawn before that meeting. Sweny seems to have represented the Chauncey Company at that interview, at which time the papers had not been executed, but they were then finally approved as the settlement of the whole transaction and were subsequently executed and delivered. That was reported to the Chauncey Company and that settlement was accepted by it.

Mr. Kidney, who was McComb's representative, testified that up to the twentieth of June McComb refused to give his consent to the construction of this sewer; that the construction of the sewer was not mentioned at any time when he was present when the Wood settlement was talked of; that the granting of an easement for the sewer had no relation to that settlement; that the connection with a sewer was talked of from time to time, Lamb insisting that it would benefit McComb's property, and that the proposed improvements of the Chauncey Company in building a club house and residences would be an advantage to McComb; that he, Lamb, wished to make the sewer connection to connect with the house sewerage of the houses that the Chauncey Company expected to build; that this was the only thing that was ever talked of in relation to this sewer connection; that there was never any agreement that there should be any sewerage connection or sewer agreement except to be used for the house sewerage on the houses when erected by the Chauncey Company, and that continued down as late as June, 1900.

Thus, from the whole testimony, I think it is entirely clear that the settlement of the Wood claim was entirely independent of this sewerage connection; that this claim was finally settled as the result of the negotiations between McClelland and Vedder, the president of the Chauncey Realty Company; that while there had

been preliminary talks between Lamb and McComb in relation to the grant of sewerage connection for the houses to be erected by the Chauncey Realty Company upon its property, the exact form of that concession was not finally determined, but was to be represented by written instruments thereafter to be executed; that this concession was subsequently asked for solely upon the ground that the development of the Chauncey Company's property, as proposed by that company, would benefit McComb's property, and that to accomplish the erection of these dwelling houses and club house and the establishment there of a residential location, McComb was willing to give a limited right to use the sewer, but that no actual easement was ever granted either verbally or in writing; that the subsequent abandonment by the Chauncey Company of its proposed improvements, the foreclosure of the mortgage upon its property, and the failure of that company to carry out its building scheme, upon the performance of which whatever promises there were were made, terminated the right of the Chauncey Company, whatever it was, and thus no easement ever became appurtenant to the property which would so attach to it as to pass by the referee's deed given in pursuance of the foreclosure of a mortgage that had been on the property prior to the time when this agreement was made, and by which the whole scheme of development of the Chauncey property, upon which whatever promises McComb made were based, was destroyed.

The title to the property acquired by the defendant the New York Juvenile Asylum was acquired by the asylum by deed from the referee, dated October 7, 1901, upon the foreclosure of the mortgage against the Chauncey Realty Company. It is not claimed that McComb was a party to that action or that in that action there was any claim to this easement. Whatever right the Chauncey Company obtained was a mere verbal understanding made after the giving of the mortgage, and was in form a personal right given to the Chauncey Company, and not as appurtenant to the property the Chauncey Company owned. By section 1632 of the Code of Civil Procedure it is provided that a conveyance upon a sale made pursuant to a final judgment in an action to foreclose a mortgage upon real property vests in the purchaser the same estate only that would have vested in the mortgagee if the equity

of redemption had been foreclosed. The use to which the property is now subjected by the juvenile asylum is entirely different from that contemplated by the parties when this oral conversation took place upon which the right of the defendant to an easement is based; and to enforce such an oral conversation by imposing upon the owners of this large and valuable property a servitude which was never thought of or contemplated, is certainly going far beyond the judgment of any court of equity in any case of which I have knowledge.

The cases where verbal contracts for easements have been enforced have generally been based upon the principle of an estoppel, where the verbal agreement was conclusively proved, and where, one party having acted on it with the knowledge of the other party to it, the principle of estoppel justified a court of equity in enforcing it. Thus it was said by Judge Earl in *Miller* v. *Ball* (64 N. Y. 291) that "the principle upon which courts of equity hold that part performance is sufficient is, that a party who has permitted another to perform acts on the faith of an agreement shall not be allowed to insist that the agreement is invalid because it was not in writing." And as was said by Judge Andrews in *Newman* v. *Nellis* (97 N. Y. 285): "But we know of no rule of law which prevents a party from performing a promise which could not be legally enforced, or which will permit a party, morally but not legally bound to do a certain act or thing, upon the act or thing being done, to recall it to the prejudice of the promisee on the plea that the promise, while still executory, could not by reason of some technical rule of law have been enforced by action." But at the time this mortgage was granted no easement of any kind had been acquired by the Chauncey Company over the property of McComb. Assuming that while the mortgage was on the property and before it was foreclosed, McComb had verbally granted a permission to connect a sewer on his property so as to drain the houses which the Chauncey Company intended to build upon the property, no such houses were ever built, but by a foreclosure of the mortgage, the defendant the juvenile asylum had acquired the right of the mortgagor at the time the mortgage was executed. Certainly there could be acquired under the judgment in this foreclosure suit no right granted by McComb subsequent to the execution of the mort-

TITLE GUARANTEE & TRUST CO. *v.* N. Y. JUVENILE ASYLUM.   541.

App. Div.]                  First Department, July, 1909.

gage which related solely to the draining of houses to be erected upon the property, but which were never erected, as an aid to the development of McComb's property, which was never developed. It seems to me, therefore, that the juvenile asylum acquired no easement in the plaintiffs' property which a court of equity could enforce. The nature of the right that was intended to be given by McComb entirely explains the reference to an easement in McComb's letter and in the proceedings of the meeting of the stockholders of the Chauncey Company. It is nowhere stated that what was granted was an easement which was to be appurtenant to the Chauncey Company's property so as to pass to a mortgagee and to be used for other purposes than that contemplated by the parties at the time the permission, license or easement was agreed to be given. And this limitation of the right, which was to be effective only for the purpose of the development which would improve McComb's property, prevented it from becoming a grant of a general easement which would attach to the freehold and pass to a grantee of the Chauncey Company. But, as before stated, the defendant does not occupy the position of grantee of the Chauncey Company, but has acquired title under a mortgage executed long before any easement or right was given, which title, under the Code of Civil Procedure, is only the right that would have been acquired had the equity of redemption of the mortgagor been foreclosed. The attempt of the defendant to establish an estoppel by virtue of the incidental conversation with one of the trustees in relation to the contract with the defendant Brown for the use of the sewer on her property is quite evidently futile. The estate could not be bound by notice to one trustee, or even by a conveyance or agreement by one trustee, and there can be no estoppel binding the estate to recognize this easement because one trustee was notified of the proposed contract and made no objection.

My conclusion, therefore, is that a finding that a general easement of a right of sewerage was granted is without evidence to support it, and that the judgment must be reversed and a new trial ordered, with costs to the appellants to abide the event.

LAUGHLIN and SCOTT, JJ., concurred; McLAUGHLIN and HOUGHTON, JJ., dissented.

McLAUGHLIN, J. (dissenting):

The referee found as a fact that McComb, who owned a large tract of land adjoining land owned by the Chauncey Realty Company, agreed if that company would settle and discharge certain claims of the estate of Wood, his brother-in-law, against Joel B. Erhardt and others interested in the realty company's property, which were in suit, by satisfying two mortgages for something over $1,000, and in addition give a note of the realty company for $2,000 to Mary Esther McComb, as administratrix, that then "he, the said James Jennings McComb, would grant and convey to the Chauncey Realty Company for the benefit of its said lands, an easement in perpetuity to use Walgrove Avenue and the sewer mains thereunder, and also to extend said mains from the terminals thereof, and to extend Walgrove Avenue in a southerly direction through his property into the lands of the Chauncey Realty Company and to use said sewer and roadway extensions, and would also grant and convey to the Chauncey Realty Company a right of way over his property, known as the Alpine Drive Turn. But it - was provided by the said McComb that said easement of sewage was to be limited to interior and not to include the roof drainage of buildings or surface drainage, and that said Walgrove Avenue extensions and the sewer thereunder were to be subject as to location to the approval of William C. Kidney, the agent of said McComb, and the sewer extension was to be built with Y's every 50 feet to furnish drainage facilities for the McComb property through which it passed."

The prevailing opinion proceeds upon the theory that this finding is without evidence to support it, and for that reason there should be a new trial. I am unable to concur in this view. I think that the finding is not only sustained by the evidence, but that a finding to the contrary would be against evidence. The fact that the realty company did settle the claims of the Wood estate against Erhardt and others, and satisfied the mortgages and gave the note is not disputed, and it could not well be in view of the receipt given on the 20th of February, 1900, by the administratrix of that estate, and which was witnessed by McComb himself. Nor is the fact disputed that the realty company did extend Walgrove avenue across McComb's property at an expense to it of $1,655, and laid there-

under some 2,300 feet of sewer mains with Y's every 50 feet at a cost of $1,810.60, which Y's were solely for the benefit of McComb's property. Nor is the fact disputed that the Alpine Drive Turn was constructed, and the sewer extension and roadway to connect with Walgrove avenue were built, all in exact accordance with the understanding with McComb and with the approval as to location of his representative, Kidney. While these facts are not disputed, it is nevertheless urged that there is no evidence to sustain the finding that the agreement as to the easements of sewerage and right of way had anything to do with the Wood settlement and was, at most, a mere license on the part of McComb which he could at pleasure revoke. The evidence is to the contrary. The witness Lamb, who represented the realty company, testified that McComb said he would give to the realty company "the right of way and the use of the sewer in consideration of our paying or giving the notes for the Wood account, and to cancel the two mortgages on the Fleming properties. He stated that the amount of the notes should be $2,000 or something to that effect; I don't recall just the amount. * * * Later, when it came to the time for constructing that sewer, I went to see him and he appointed Mr. Kidney to go with me to point out those places where the old sewer left off or where the right of way through the Schaffenberg place should be." He was then asked : " Q. Was anything said at any of those interviews as to the character or duration of this easement ? " And he answered : " Yes, sir. It was to be a perpetual easement. Mr. McComb said he would give that." He further testified that McComb himself and his representative were on the ground after the work had been commenced. Kidney stated that he went with Lamb and looked over the ground and finally agreed with him as to the location of the road ; also that he heard a conversation between Lamb and McComb " about a sewer right, about a connection with the sewer, along in the spring of 1900."

When the whole subject is considered, it is perfectly obvious that the realty company was negotiating not for a mere personal license, but for something which should be permanent — something which should be appurtenant to and run with the property which was to be developed. It wanted a way onto its land and a right to sewer therefrom. It is improbable that the company would expend large

amounts of money in building nearly half a mile of roadway and lay an eight-inch sewer main, both of which were of substantial benefit to the McComb property, and secure nothing permanent in return for itself. That McComb intended to grant not a mere license to the realty company, but an easement of sewerage and roadway is apparent from his own written statement. Shortly following the time Lamb testified the agreement was made, when McComb was urged to become further interested in the realty company, and on the 7th of December, 1900, he wrote its president as follows: "I think I have afforded you assurance of my desire to further the interests of all concerned by the concessions already made in the matter of a roadway through my property, including easement for the right to lay sewer and other pipes therein, which have already become an embarrassment to me in a negotiation now pending for the sale of the Springhurst or Schaffenberg property in its entirety as when I bought it." What did he mean by the use of the word "easement?" Clearly not a mere license which he could revoke at pleasure, because if so he would have revoked it instead of allowing the same to "become an embarrassment" in a negotiation for some of his property over which the "easement" extended. When this statement is considered in connection with the written report of the president of the realty company to its stockholders a few days later — to which McComb took no exception and made no objection — it seems to me conclusive that he not only intended, but supposed he had bound himself to give to the realty company a perpetual easement of sewerage and roadway. The annual meeting of the stockholders of the realty company was held on the 8th of January, 1900. Kidney attended the meeting as proxy for McComb. The president of the company then reported the facts as to the Wood settlement; the satisfaction of the two mortgages; the giving of the $2,000 note, and that "The company also received from J. J. McComb a deed for the right of way over his property for the purpose of the Alpine Drive, and an agreement by Mr. McComb to convey sewerage rights and other rights of way over his property in connection with the Walgrove extension and sewerage." A copy of the report was subsequently sent to the stockholders, including McComb, and Kidney testified that he "talked over the report with Mr. McComb" and that neither he nor

McComb ever made to the realty company any protest against the statement therein contained to the effect that the company had received from McComb "an agreement  *  *  *  to convey sewerage rights and other rights of way over his property in connection with the Walgrove extension and sewerage."

We have, therefore, not only the testimony of the witness, Lamb, that McComb agreed to give a perpetual easement of sewerage and roadway, and the testimony of the witness, Kidney, that he heard the matter discussed between them, but we have also the written statement of McComb himself that he had given such easements and the written report of the president of the realty company to its stockholders to the same effect, to which he did not in any way object.

There is other evidence in the record tending to show that what he agreed to give was not a mere license, but an easement. Enough has been referred to, however, to indicate that the finding to which reference is made in the first part of the prevailing opinion, instead of being without evidence to support it, is abundantly sustained by the evidence. We start, therefore, with the proposition that McComb did agree to give such easement, and the question is, is it of such a kind or character as a court of equity will enforce? In answer to the question it is suggested that since no deed had been given when the asylum purchased the property the agreement was a mere chose in action and did not pass under the foreclosure sale. But it is to be observed that when the property was sold the sewer and roadway had been completed. So far as the realty company was concerned the contract had been performed. It had built the road and sewer across the McComb lands precisely as it agreed to do. All that remained was to connect whatever buildings might be erected upon its property with the sewer which extended some twenty feet onto its land. This was the condition when the asylum took title. The conveyance by the referee of the land covered by the mortgage carried with it as an appurtenance to the thing conveyed, McComb's agreement to give an easement of sewerage and roadway. It was the visible means of access to and from the property. It was the only system of sewerage connected with it.

The case in some respects is much like *Newman* v. *Nellis* (97

N. Y. 285). There the defendant had promised orally to open a street over his property for the use of his grantee, plaintiff's husband and others. The street was thereafter opened and used and the court held that the plaintiff, who had subsequently acquired the property conveyed to her husband, could restrain the defendant from closing the street, ANDREWS, J., saying: " The right of the plaintiff to maintain the action is questioned on the ground that the right of way did not pass to her by the deed from her husband. The way or street is not mentioned in the deed, nor is the word 'appurtenances' used. But the way was an apparent easement at the time the deed was executed, and if it was then legally appurtenant to the lot, or in other words, if it was enjoyed by right by the plaintiff's husband as an appurtenance to the land, it passed by the conveyance of the lot by metes and bounds, although not mentioned and although the word 'appurtenances' was not used. (*Huttemeier* v. *Albro*, 18 N. Y. 48; 2 Wash. 279.)* We are of opinion that the way having been opened, and the right which before rested in contract having thereby become consummate by the act of the owner of the land, in pursuance of a promise based upon a valuable consideration, although by parol, the easement became a perfect legal right attached to the land, the burden and benefit of which bind the respective parcels and follow the legal title."

The principle announced in that case, it seems to me, should be applied to this. For a valuable consideration McComb had agreed to grant the easements in question and in pursuance of the agreement the realty company paid the consideration, entered upon his land, and at a large expense constructed the sewer and roadway as the parties had agreed. The contract having been performed by the realty company it thereby acquired a right or easement which a court of equity ought to enforce or protect, and this easement or right, whichever it may be called, passed to the asylum. (*Dempsey* v. *Kipp*, 61 N. Y. 462; *Rindge* v. *Baker*, 57 id. 209.) As was said in the case last cited: " As a court of equity will take a parol contract for the sale of lands out of the statute of frauds, when it is partly performed, it will, on the same principle, treat an executed parol contract for an easement as equivalent to a grant under seal, where the parties cannot be restored to their original position."

* See 2 Washb. Real Prop. (3d ed.) 279.— [REP.

Here, it is perfectly obvious that the parties cannot be restored to their original position, and for that reason the court ought to exercise its equitable powers to compel the representatives of McComb to do what he agreed to and this because of the well-recognized rule that where one person has induced another, upon the faith of his promise, to spend money or labor for which he can only be remunerated by the enjoyment of the thing promised, equity will compel the promisor to give such writing as will enable the promisee to enjoy the thing promised. (*Flickinger* v. *Shaw*, 87 Cal. 126; *Russell* v. *Hubbard*, 59 Ill. 335; *Joseph* v. *Wild*, 146 Ind. 249; *Raritan Water Power Co.* v. *Veghte*, 21 N. J. Eq. 463; *Lacy* v. *Arnett*, 33 Penn. St. 169; *Olmstead* v. *Abbott*, 61 Vt. 281.)

It would be most unjust and inequitable, as the case now stands, to deprive the asylum of the right to use the sewer and roadway. It has spent between $800,000 and $900,000 upon its property and unless it can use the sewer as it now exists it will cost in the neighborhood of $100,000 more to provide sewer facilities. It nowhere appears that the use of the sewer will injure the plaintiffs or be prejudicial to their rights, but unless the asylum can do so it must necessarily result to its great damage. Under such circumstances a court of equity ought to enforce the agreement which McComb made. (*Rindge* v. *Baker, supra; Miller* v. *Ball*, 64 N. Y. 286; *Newman* v. *Nellis, supra; Hay* v. *Knauth*, 169 N. Y. 298.)

I think the judgment appealed from should be affirmed, with costs.

HOUGHTON, J., concurred.

Judgment reversed and new trial ordered, with costs to appellants to abide event.